[No. C064377. Third Dist. Mar. 7, 2013.]

THE PEOPLE, Plaintiff and Respondent, v.
RICHARD EUGENE HENDRIX, Defendant and Appellant.

220

**COUNSEL**

Alex Green, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Carlos A. Martinez and Catherine Tennant Nieto, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**MURRAY, J.**—Defendant Richard Eugene Hendrix was convicted of resisting an executive officer by use of force or violence in the performance of his duty in violation of Penal Code section 69. In a separate bench trial, the court found true an alleged prior strike. Defendant was sentenced to six years in state prison.

Defendant's first trial ended in a mistrial when the jury declared it was unable to reach a verdict. Prior to the second trial, the prosecution moved in limine to admit five incidents involving prior encounters defendant had with the police. Over defendant's objection, the trial court in the second trial ruled that evidence concerning two of the prior incidents, in which defendant unlawfully resisted the police, would be admissible. These two prior incidents were admitted into evidence at the second trial through live testimony of some of the police officers who were involved. The second jury returned a guilty verdict.

Defendant contends the trial court committed reversible error in admitting evidence of the two prior incidents of defendant's misconduct. While evidence of uncharged offenses is admissible under the appropriate circumstances, our high court has cautioned that evidence of this kind " 'is so prejudicial that its admission requires extremely careful analysis. [Citations.]' " (*People v. Ewoldt* (1994) 7 Cal.4th 380, 404 [27 Cal.Rptr.2d 646, 867 P.2d 757] (*Ewoldt*).) Accordingly, we have carefully analyzed the prior incidents admitted here. We agree with defendant and reverse.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.   The Charged Offense

We shall summarize the underlying facts to provide context to the prosecution's offers of proof regarding the uncharged crimes and discuss the trial evidence in more detail, *post*.

Defendant was charged with violating Penal Code section 69 in that, by use of force and violence, defendant *knowingly* resisted Luke Mosley, a Sacramento police officer, in the performance of his duty.

On the night of March 21, 2009, defendant fought a private security guard at an apartment complex. The security guard twice sprayed defendant in the face with pepper spray. He also fired a shot in defendant's direction. Defendant then fled. Later, the Sacramento police and additional security guards arrived on the scene. The police were in dark blue uniforms, the security guards in black uniforms.

After the police arrived, defendant was spotted near a garbage enclosure area. He was intoxicated. Defendant exited the enclosure and began pacing back and forth and yelling incoherent gibberish. Instead of complying with the officers' commands to get on the ground, defendant looked in the direction of the officers and fled. Taking different routes, the police and the security guards chased after defendant. During his flight, defendant either tripped or ran into a parked vehicle and Officer Mosley ran into him. Other police officers caught up to him and, while Officer Mosley attempted to detain defendant, defendant used force against Officer Mosley. None of the officers could remember whether they had identified themselves as police during the encounter.

There was no question that defendant resisted. Defendant contended the proof failed to establish beyond a reasonable doubt that he knew the person he resisted was a police officer. Defendant asserted that, because he had been

pepper sprayed earlier, was intoxicated and the lighting was not good, he might have confused Officer Mosley for a security officer.

## II. In Limine Motion Concerning the Prior Offenses

The prosecutor sought admission of evidence concerning five prior incidents involving defendant's encounters with the police under Evidence Code section 1101, subdivision (b).[1] These incidents were labeled 4a through 4e. The trial court's ruling allowing evidence concerning two of the five incidents was based on the prosecutor's proffer in the in limine briefing.

The two incidents admitted by the trial court, after some redaction, were described in the prosecution's in limine brief as follows:

"b. On May 25, 2005, security guards witnessed domestic violence occurring between Corvette Hendrix, the Defendant's sister, and her boyfriend. The Defendant then got involved. SPD Officer Mueller attempted to detain him, but he violently resisted. When he was being transported to jail, he repeatedly threatened the [sic] SPD Officer Wycinski who was driving. He asserted that he would look up the officer's address on the [I]nternet, and come 'get him.' At the station, he yelled, 'You better change your beat.' [¶] . . . [¶]

"e. On September 18, 1993, Alameda Police Officer Simmons responded to reports of an intoxicated person causing a disturbance. He contacted the Defendant, who was displaying objective signs of intoxication. The Defendant passively resisted as Officer Simmons placed handcuffs on him. The Defendant tried to wriggle out of the officer's hold as they walked to the police car. He then refused to get into the vehicle. He kicked at another officer who was trying to assist. Once placed in the car, he lied [sic] on his back and moved his hands to the front of his body. He kicked the patrol [car] door. Officer Simmons removed the Defendant from the patrol car, and the Defendant started to struggle again. The deputies placed him back in the patrol car, this time with a hobble, but the Defendant ripped it from his feet. When Officer Simmons tried to replace it, the Defendant spit in his face. The Defendant was finally transported to a holding cell. He hit, kicked and tried to ram the door with his body. He also tried to cover the camera in the cell."

The incidents the trial court excluded were described as follows:

"a. On June 7, 2006, the Defendant was contacted at Franklin Villa Apartments, and taken into custody for an outstanding warrant. SPD Officer

---

[1] Undesignated statutory references are to the Evidence Code.

Pinola placed him in the rear of a patrol vehicle. The Defendant then proceeded to kick the patrol vehicle window, pushing the window outside of the door frame.

"c. [A]fter the Defendant was booked [for the incident described in 'b'] Deputy Reeve was informed that the Defendant kicked the holding cell door. When the deputy entered the cell to remove the Defendant, the latter took a bladed stance. With the assistance if [*sic*] Deputy Nelson, Deputy Reeve placed the Defendant into a control hold to escort him to a sobering cell. The Defendant called the deputies cowards. When they arrived at the holding cell, he failed to comply with directives, physically struggled with the deputies, and threatened to 'kick their asses.' As Deputy Wade tried to leave the cell, the Defendant physically assaulted him, choking and scratching him.

"d. On January 1, 1999, SSD Deputies Morris and Maxwell responded to a domestic violence call. When they arrived, they heard glass breaking down the street. They ran toward the sound, and observed the Defendant standing in front of an apartment with a golf club in his hand. There was broken glass on the ground. They detained the defendant, and placed him in the back of their patrol vehicle. The Defendant started threatening to kill them. He said he was a 29th Street Crip, and would kill any officers who came into G Parkway. He kicked the rear window of the patrol vehicle 10–15 times as he continued to threaten and spit at the deputies."

In the in limine briefing, the prosecution contended that, under section 1101, subdivision (b), these prior incidents were "admissible to establish that the Defendant knew that Officer Mosely [*sic*] was a police officer who was performing his duty. The evidence is particularly important in this case as the Defendant asserts that he did not know he was being pursued by police officers." The prosecution further sought to introduce the prior incidents "for the purpose of rebutting any implication of mistake of fact or self defense."

The prosecution supplemented its theory of admissibility at oral argument on the motion: "I think that given the fact that the defendant has had interactions—intimate interactions with law enforcement reaching back into the early [1990's] and that *he has dealt with them in an aggressive and resistant manner despite knowing they were officers in each instance speaks to his knowledge in this case,* just like a drug case showing that someone has dealt with narcotics before and has suffered some kind of arrest or conviction, it's analogous to this situation. [¶] [*T*]*he fact that the defendant has acted in this manner with officers in the past* goes to the fact that he had full knowledge that they were officers he was dealing with in this case." (Italics added.)

Defense counsel objected to the admissibility of all the prior incidents. He challenged the 1993 incident on remoteness grounds. As for the prosecution's knowledge theory, defense counsel acknowledged that the defense he was prepared to advance would put the element of knowledge in active dispute but argued, "The fact that [defendant has] dealt with the police in the past I don't believe makes him unique compared to 100 percent of the population in our community who know what a police officer uniform means. It means a person wearing it is a police officer. [¶] . . . I don't think that there needs to be any particularized showing based on prior contact with police that he knows that such a thing as police officers exist . . . . [¶] The question is, did he know on this particular instance that he was dealing with the police, and I don't believe these incidences help show that because *in this particular instance his first encounters were with an armed security guard* in a uniform with badges, with a gun, with a car with spotlights, and then he was pepper sprayed twice in the eyes by that security guard. [¶] And I think it's a fair inference my client couldn't see very well, because the security guard had a hard time seeing from the minimal amount of pepper spray he got in his eyes. So the question is, is his knowledge in the particular cases that he's dealing with police officers aided by the introduction of these past incidents. I propose that it's not aided and I think that the danger is these incidents showing [a] propensity toward having assaults or fights with police officers. . . . I believe they are likely improper propensity evidence and also more prejudicial than probative."

The prosecution countered the remoteness contention arguing, "whether he gained the knowledge in '93 or he gained the knowledge five years ago, it's knowledge that he has." The prosecution further argued that "the fact [defendant] has had multiple intimate engaged contacts with the officers over the years gives him an intimate knowledge and familiarity with officers that a lot of us don't have. Sure, we can all look at a uniform and recognize a person as an officer, but he's gone through multiple experiences where officers have responded to a scene where they've given commands, where they've handled him in physical ways, a lot of things that a lot of us haven't experienced that should have alerted him to the fact that these were officers in addition to the uniform, and the patrol vehicles." With respect to rebutting a mistake of fact theory, the prosecution contended that defendant's "underlying assertion would be the defendant wouldn't have acted the way he did if he knew these were police officers he's dealing with. And this information, this evidence of his prior conduct, goes directly to that question and is extremely probative."

Defense counsel rejoined, "I . . . want to make clear that I'm not arguing my client would have acted differently if he knew these were security guards versus law enforcement officers. My argument in that regard would be they

have to prove that he knew these were officers in the lawful performance of their duties. And if they don't prove that, then that's a defense."

After hearing further argument, the court excluded the incidents described as incidents "a," "c" and "d," finding that evidence "not very probative to this case" and "much more prejudicial than probative."

The trial court, however, granted the motion with respect to incidents "b" and "e," the 2005 and 1993 incidents, allowing those incidents for the limited purpose of showing knowledge and to rebut mistake of fact.

The trial court explained that these incidents "demonstrate that [defendant] has knowledge that he knows what a police officer does in terms of an arrest. That he knows when someone—a police officer tries to arrest you, what they do when law enforcement takes someone into custody. And I find that this does go to the issue of knowledge, which is an element that the People have to prove beyond a reasonable doubt." With respect to mistake of fact, the court stated, "on these particular facts the knowledge and the mistake of fact [are] very closely intertwined."

The trial court specifically ruled that the evidence it was allowing was "more probative than prejudicial" and that the probative value "outweighs any probability that its admission will necessitate undue consumption of time" or "confuse the issues or mislead the jury." The court stated it would give the appropriate limiting instruction.

While the trial court permitted evidence of the 2005 and 1993 incidents, it also limited the admissible scope of these incidents. As to the 1993 incident, the trial court precluded admission of defendant's postarrest conduct that he "may have engaged in in the holding cell and in the patrol car." The court permitted evidence up to the point in the proffer of: "He kicked at another officer who was trying to assist" as they attempted to place defendant in a patrol car.

As to the 2005 incident, the court initially did not exclude any of the postarrest events and behavior of defendant. The court allowed evidence of the threats defendant made against the officer while being transported to the jail, including that defendant would look up the officer's address on the Internet and come "get him." Also, by its initial ruling, the court allowed the threat defendant made to the transporting officer after their arrival at the jail, "You better change your beat." The trial court did not elaborate on the reasoning underlying this ruling. The following morning, the trial court precluded the threat defendant made at the jail, finding that it was not relevant or probative, because the threat was made at the jail.

Several days later, the prosecution indicated a desire to introduce evidence concerning defendant's refusal to give his name to the officer who transported and booked him during the 2005 incident. The prosecutor advanced no theory of relevance as to this testimony and only indicated defendant's refusal was not an invocation of his *Miranda*[2] rights. The court sustained defendant's objection to that evidence, saying ". . . it's just not probative to knowledge. It's not probative to . . . the elements that are charged in this case, and the court is already allowing you to bring in the threats and violence with respect to that incident which are relevant, material, and probative, more probative than prejudicial. And I just don't want the jury to get confused as to all this other minutia, which is not really probative at all. So for that reason, it is excluded." Again, the trial court did not elaborate as to why the threats defendant made during transport from the scene in the 2005 incident were "relevant, material, and probative"; nor did it elaborate upon defendant's undue prejudice objection. Thereafter, evidence of the 2005 incident was presented to the jury.

On the following day of trial, just before testimony concerning the 1993 incident, counsel for defendant sought further clarification on the evidence the jury would hear. Counsel's concern focused on defendant's postarrest threats and other conduct in the police car and at the jail. The trial court allowed argument to be reopened on this evidence. The prosecution argued that evidence concerning defendant's conduct inside of the patrol car and at the jail was similar to the evidence in this case and the evidence that had already been introduced on the 2005 incident. The trial court reiterated its earlier ruling precluding the postarrest conduct in the 1993 incident. In doing so, the trial court specifically noted that it did not find defendant's postarrest conduct to be "anywhere as probative" as the conduct leading up to his being put into the patrol car.

### III. Trial Evidence

### A. Prosecution's Case

#### 1. *The charged offense*

On the evening of March 21, 2009, Justin McCall was on duty as a private security guard at the Countrywood Apartments (Countrywood) in Sacramento. He was dressed in a black uniform with shoulder patches that depicted an American eagle and lettering that read "American Private Security." He had a badge on his left chest. He also wore a utility belt and carried pepper spray and a gun.

---

[2] *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602] (*Miranda*).

McCall testified that he had had training required by the Bureau of Security and Investigative Services, which included the "power to arrest," weapons, and how to use pepper spray and a baton. He explained that the Countrywood complex was regarded as "high priority" by the Sacramento Police Department and had a "lot of issues with domestic violence, drugs, fights, shootings." McCall worked with "POP officers pretty much all of the time." "POP" stands for "problem-oriented policing." There is a special team of Sacramento POP officers assigned to the Countrywood complex.

In light of the criminal activity at Countrywood, the complex had a "no loitering" rule that applied to common areas, including the parking lot. Multiple antiloitering signs were posted on the grounds, residents were notified of the rule by flyers, and the no loitering rule was included in the lease agreements for the residents of the complex.

At approximately 8:00 p.m., McCall was on patrol in the complex in his marked security vehicle. He observed an individual sitting inside a parked car in the parking lot. McCall continued to drive and circled back a minute or two later. The person was still inside the parked car. McCall aimed his vehicle's lights into the parked car. The person sitting inside, whom McCall identified as defendant, exited and began screaming and cussing. McCall recognized defendant. On six to eight prior occasions, without incident, McCall had asked defendant to leave the complex's parking lot where defendant had been loitering.

With McCall's lights aimed at him, defendant proclaimed that McCall was "doing too much" and approached McCall's vehicle. Defendant threatened that he was "going to kick [McCall's] ass." McCall warned defendant several times to return to his car and leave the property or to go inside his apartment. Defendant did not comply and continued to swear and scream. Defendant balled up his fists, swung his arms around, and acted very upset.

McCall got out of his vehicle. He advised defendant once again to get inside his car and leave the property or to go inside his residence. Defendant walked toward McCall and threw a shoulder into McCall's chest. McCall pushed defendant back and sprayed defendant in the face with pepper spray from about three feet away. The spray hit defendant in the eyes. Defendant immediately "grabbed his eyes," and then walked away, rubbing them. Because it was windy, "a little" pepper spray went into McCall's eyes. McCall could still see, but his vision was impaired and his eyes watered. McCall radioed his security company for backup and then walked around the complex to locate defendant. McCall explained that he usually called for backup security officers to assist when detaining people.

McCall spotted defendant near the complex's swimming pool. Defendant was rubbing his eyes and walking around swearing. When defendant noticed McCall, defendant began running toward McCall, stating that he "was going to kick [McCall's] ass." Defendant was probably more than 30 yards away from McCall when he started toward him. McCall ordered defendant to stop and get on the ground.

Defendant continued to run toward McCall and jumped in the air to kick McCall. Defendant then swung and hit McCall in the chin. In response, McCall punched defendant and then grabbed defendant and threw him back. McCall sprayed defendant with pepper spray from five to six feet away. McCall was not sure if the pepper spray got into defendant's eyes, but he did spray defendant in the face. McCall again got some in his own eyes—this time more than the first time he sprayed defendant. Defendant came at McCall again and the two started fighting. McCall grabbed defendant and threw him back. Defendant got up, stated he was going to kill McCall, and reached behind his back. It appeared to McCall that defendant had something in his hand, but he was unsure because the pepper spray was impairing his vision. McCall feared for his life, so he drew his gun and fired a shot in defendant's direction. Defendant fled.

A resident assisted McCall to a restroom, where McCall washed his eyes. Approximately five minutes later, McCall's backup security guard arrived, also in uniform. Initially, McCall and the backup security guard began searching the complex for defendant, but they eventually stopped and decided to wait for the police. According to McCall, the police arrived two to three minutes later.

Around 9:00 p.m., Sacramento Police Officers Luke Mosley, Lisa Khang and Gerald Landberg responded to Countrywood on a call of assault in progress. The officers arrived in marked police cars and were wearing their full police uniforms, described as a "navy blue uniform with a . . . marked badge, waist duty belt equipped with [a] gun . . . handcuffs, name, badge." However, the record does not reflect whether the officers were in short sleeves, long sleeves, or coats. The emergency lights on their vehicles were not flashing and their sirens were not on when they arrived.

The police talked with McCall and discussed what had transpired. As the police and McCall walked the grounds, McCall spotted defendant, now shirtless, walking out of an "apartment complex," heading toward a dumpster enclosure area. Defendant was 40 to 50 feet away. While not mentioned during the testimony of Officer Mosley or Officer Khang, Officer Landberg observed that defendant was carrying something in his arms. Landberg thought defendant was going to throw something away. McCall identified

defendant as his attacker. To avoid further conflict with defendant, Officer Mosley instructed McCall not to go any farther.

The three police officers—Mosley, Khang, and Landberg—approached the dumpster enclosure area.[3] Although it was dark out and the enclosure did not have an overhead light, the area was well lit from surrounding sources. None of the officers testified that defendant looked in their direction as he walked toward the dumpster area. As the officers moved closer to the enclosure, they heard a bang or crash-boom noise coming from inside. Officer Landberg thought it was the sound of something being thrown into the dumpster. The officers drew their firearms, fanned out in triangulated positions, and requested defendant to come out. Defendant exited the dumpster enclosure area. He appeared extremely agitated and sweaty. Defendant paced back and forth in circles in front of the enclosure's opening, flailed his arms, stuck out his chest, and yelled incoherent gibberish. The yelling was random and not directed at the officers. According to Officer Mosley, as defendant paced in circles, there were times when defendant was not looking in the direction of the officers. Khang testified similarly, saying while defendant paced, he looked at the officers, but also looked away. The officers commanded defendant to stop what he was doing and get down on the ground. Defendant did not comply. The officers were approximately 10 to 20 feet away from defendant at this point. According to the officers, defendant was not rubbing his eyes and there was no apparent indication that he had a problem seeing. Officer Mosley testified that defendant stopped pacing, looked at the officers "for a couple of seconds," said "Fuck y'all," and started running.

According to Officer Mosley, defendant paced for a period of approximately 30 seconds before running. Officer Khang approximated "a couple of seconds." Unlike Officers Mosley and Khang, Officer Landberg testified that when defendant stopped pacing, he turned in the direction of the officers and assumed a fighting stance, with one leg behind the other and his hands raised up to his chest area, and stared at the officers for five to seven seconds while in this stance. According to Landberg, defendant continued to yell at the officers at that time. Then defendant said "fuck y'all" and fled.

The police officers gave chase. Officer Mosley, followed by Officer Khang, ran behind defendant, while Officer Landberg broke off and took a parallel route, hoping to cut defendant off. McCall and the other security guard also chased after defendant, taking a different path than the officers.

Officer Mosley testified that he was directly behind defendant and observed defendant trip over a planter and fall to the ground. After defendant fell, he

---

[3] According to Officer Mosley, neither Officer Landberg nor Officer Khang (who was a woman) resembled McCall.

started to rise. Officer Mosley closed the gap within a matter of seconds, and while still running, he ordered defendant to stay down on the ground. Mosley was approximately 10 feet from defendant at this point. According to Officer Mosley, defendant continued to rise, "looked right at" Mosley and took a bladed stance, which Mosley described as "a boxer's stance, kind of one foot back, stable platform, kind of shoulder width apart, just preparing yourself to get into some kind of confrontation." While he was still running toward defendant, Mosley decided he did not want to let defendant "get fully set up and engaged and ready to fight." Before defendant could raise his hands in an aggressive manner, Mosley ran full speed at defendant and knocked him into a parked car. Mosley attempted a "control hold" on defendant's right arm. According to Officer Mosley, the chase lasted less than a minute, and only a matter of "[s]econds" elapsed between defendant getting up after tripping and Mosley tackling him. Mosley said the lighting in the area where he collided into defendant was similar to the lighting in the area of the dumpster. He described this area as "pretty well lit up."

During the struggle, Officer Mosley detected a strong odor of alcohol coming from defendant and noticed that defendant had bloodshot and watery eyes. According to Mosley, defendant was "obviously under the influence." Officer Mosley testified that "[a]lmost instantly" after he made contact with defendant, defendant grabbed Officer Mosley's neck and squeezed it, causing shortness of breath. Officer Mosley clamped down on defendant's hand and pulled it away. It was at that point, according to Officer Mosley, that Officer Landberg arrived and, from behind, grabbed defendant around the ankles. Defendant fell to the ground, landed on his back, and then kept his arms rigid or locked. Officers Mosley and Landberg rolled defendant on his stomach. Officer Khang then arrived and assisted the officers in cuffing defendant. Defendant was strong and the officers had to use substantial force to get him cuffed.

Officer Khang was unavailable to testify at the second trial, but her testimony from the first trial was read to the second jury. Her testimony differed from Mosley's as to what occurred when Mosley caught up to defendant. Officer Khang ran behind Officer Mosley. When Officer Mosley dropped his handgun, Officer Khang stopped to retrieve it, causing Officer Khang to fall about six parking stalls or "thirty or so feet" behind during the pursuit. Officer Khang resumed the chase after retrieving the gun and observed defendant "turn his head around" as he was running. Defendant then ran into a parked minivan. Officer Mosley collided into defendant and the van, wrapping his arms around defendant's upper body in a bear hug. At that point, Officer Khang was "a little closer" than the six parking stalls she had fallen behind when she picked up Officer Mosley's gun. After Officer Mosley wrapped his arms around defendant, the two of them then "did a kind of 360 while they were still standing." Officer Landberg arrived and while Mosley

still had his arms around defendant, Landberg pulled defendant's legs out from under him. All three then went to the ground. Officer Khang stated that she was still running toward the three of them at that point and was unsure how far away she was, but testified she had a "pretty good view" of what occurred after defendant ran into the minivan. She caught up "[r]oughly around five [seconds]" after Officer Mosley had wrapped his arms around defendant and assisted in attempting to detain defendant.

Officer Landberg testified that he observed defendant trip over the planter, and quickly get up. Thereafter, Landberg ran in a direction to cut off defendant, losing sight of defendant before defendant was fully upright. Within a "matter of moments" after defendant got up, Officer Landberg heard a "crash" or a "crunch." Landberg circled around a vehicle and observed defendant and Officer Mosley in a physical altercation. The two were upright, facing each other, and Officer Mosley had his back to the vehicle. Officer Mosley was holding one of defendant's arms and there was a distance of six to eight inches between them. Officer Mosley was trying to take defendant to the ground, but was having a hard time doing so. Officer Landberg grabbed defendant by his ankles and lifted defendant's feet and defendant fell onto the ground. Defendant kept his arms rigid, but the officers were able to roll defendant over on his stomach and handcuff him. Officer Khang ran up and helped handcuff defendant.

None of the three officers remembered identifying themselves as police officers during the encounter. Officers Mosley and Landberg both testified that they did not write in their written reports that they had identified themselves as police officers. Officer Khang wrote a report about her conversation with McCall, but she was not asked whether she included information in her report about whether the officers identified themselves to defendant. Officer Mosley testified that while not required, identifying themselves as police is a recommended practice—but they would not have necessarily done so in a situation where they were face-to-face with an individual. Neither Officer Khang nor Officer Landberg saw defendant choking Officer Mosley.

Defendant was arrested and placed in Officer Kenneth Collier's patrol car. As Officer Collier started to read defendant his *Miranda* rights, defendant remarked, "I ain't no citizen anymore. Revoke my citizenship." When Officer Collier asked defendant whether he understood his rights, defendant replied, "suck my dick." Officer Collier considered that a refusal to talk further and ceased further communication with defendant.[4]

---

[4] Over defendant's in limine objection, the court determined that defendant's statements did not constitute an unambiguous invocation of his right to remain silent, and defendant does not raise this issue on appeal.

Because defendant had small cuts on the outside knuckle area of his hands, defendant was transported to the hospital. When the transporting officer, Officer George Martinez, removed defendant from Officer Collier's patrol car, defendant shouted loud profanities. At the hospital, defendant intermittently swore. Officer Martinez cautioned defendant to stop swearing because children were present and people were trying to help him. Ultimately, hospital staff asked Officer Martinez to take defendant away. Defendant refused medical treatment and the hospital staff medically cleared him. At the jail, defendant continued to be loud and obnoxious to a jail nurse.

Officer Mosley sustained a half-inch gash on the right side of his neck during the incident. The injury ultimately became infected and Mosley sought medical treatment.

## 2. The effects of pepper spray

Both Officers Mosley and Landberg testified that, during their police training, they had been intentionally exposed to pepper spray. Officer Mosley had pepper spray dabbed on the bridge of his nose, after which the spray pooled in his eyes. Officer Mosley explained that it hurt his eyes, caused his eyes to shut, and turned him into a "big slobbery mess." Officer Mosley further described the experience by saying, "It's horrible." Despite standing with his face under a shower for 30 minutes beginning about five minutes after he was exposed, the burning in Officer Mosley's eyes continued for approximately 45 minutes. Without the assistance he was provided, Officer Mosley would have had trouble walking around. Once he was able to open his eyes, he could see "fine." Officer Mosley testified that defendant did not appear to be a big "slobbery mess" when he encountered him.

When Officer Landberg was sprayed, the pepper spray was aimed at his forehead. Water was then applied to his forehead so the solution dripped down his face. It became very hard for him to see and breathe, his eyes watered, and he could not keep them open. His face burned as if he had a sunburn. Officer Landberg testified that he was taught that "everybody reacts differently" to pepper spray and it has "no effect" on a "small portion of society."

## 3. Prior offenses

The prosecution finished its case-in-chief by putting on evidence of the 2005 and 1993 incidents.

a. *Trial testimony concerning the 2005 incident*

Two Sacramento police officers testified about the 2005 incident. Officer Robert Mueller testified regarding the events leading up to and including defendant's arrest. Officer Jonathan Wycinsky testified regarding defendant's postarrest conduct.

According to Officer Mueller, on May 25, 2005, he responded to a call to assist Sacramento Police Sergeant Greg Smythe with a fight in progress. Officer Mueller proceeded to Franklin and G Parkway, a "POP area," in a marked patrol vehicle wearing his standard police uniform. While Officer Mueller wore the department's standard uniform, including a jacket, during his testimony, he thought he might have been in short sleeves during the 2005 incident. The short-sleeved uniform was not further described for the jury.

When Officer Mueller arrived on the scene, he observed Sergeant Smythe speaking with a Mr. King at the entry point to the gated neighborhood. The two men gestured up the street. Sergeant Smythe pointed to defendant and defendant's sister Corvette Hendrix, who were approaching from some 80 feet away, and asked Officer Mueller to speak with them. Officer Mueller approached defendant and Ms. Hendrix as they were walking toward Mr. King. According to Officer Mueller, a security guard from the apartment complex was also present at the entry to the neighborhood, but Mueller provided no testimony about what that security officer was doing or what the security officer's involvement had been up until that point; no other witness did either.

Officer Mueller noticed blood on Ms. Hendrix's lip. Both Ms. Hendrix and defendant smelled of alcohol and had alcohol on their breath. Officer Mueller testified that he tried to stop them as they walked toward Mr. King, but Ms. Hendrix stated that she wanted to take matters into her own hands. Ms. Hendrix and defendant appeared agitated and angry. Both were clenching their fists, and wanted to "get at Mr. King." Ms. Hendrix said that Mr. King had hit her with a brick.

Officer Mueller tried to keep Ms. Hendrix and defendant separated from Mr. King. Officer Mueller put his hands up to halt their forward progress, but to no avail; Ms. Hendrix and defendant walked on by. Officer Mueller attempted to stay in front to direct them away from Mr. King.

Sergeant Smythe left Mr. King at the gate and approached defendant. Meanwhile, Officer Mueller took control of Ms. Hendrix, physically escorting her to his patrol car.

After securing Ms. Hendrix in his patrol car, Officer Mueller turned around and observed Sergeant Smythe struggling with defendant. Sergeant Smythe

was holding defendant's left arm and trying to get defendant to put his hands behind his back. Sergeant Smythe instructed defendant to put his hands behind his back and to stop resisting. Defendant was pulling away from Sergeant Smythe and stating he was not resisting—"he wasn't doing anything." Officer Mueller went to assist. Sergeant Smythe was not called to testify and there was no evidence concerning what occurred between him and defendant while Officer Mueller was focused on detaining Ms. Hendricks.

Officer Mueller grabbed defendant by his right arm and right wrist and attempted to get defendant's hands behind his back. The officers kept telling defendant to put his hands behind his back. Defendant continued to resist and Officer Mueller forced defendant to the ground by his right arm and right wrist. Defendant hit the ground facedown and put his hands underneath his chest. The officers ordered defendant to pull his hands out and physically attempted to retrieve defendant's hands from underneath his body. The security guard who controlled the neighborhood entry gate came over to assist. The security guard did not testify, and there was no evidence indicating he or any other security guard had been involved with defendant up until this point.

The security guard sprayed defendant's face with pepper spray and defendant continued to struggle for another 20 seconds before he was handcuffed. In total, the two officers and the security guard struggled with defendant for approximately 30 seconds. Eventually, defendant's arms were pried loose from underneath him, put behind his back and he was handcuffed. At this point, Officer Wycinsky arrived. There was no testimony about how the pepper spray affected defendant other than that he continued to struggle with the officers for approximately 20 seconds after it was applied.

Officer Wycinsky was a Sacramento POP officer in the area, an area he described as "riddled with crime for 30 years," as having a "very bad gang problem" and a "very bad drug problem," and as "probably the worst neighborhood in the city" at the time. The area has one entry/exit with a security shack, and barbed wire and/or metal fences surround it.

When Officer Wycinsky arrived, he was informed of defendant's arrest and instructed to place defendant in his patrol car. Officer Wycinsky did so and transported defendant to jail. Consistent with the trial court's in limine ruling, Officer Wycinsky testified as to what transpired during defendant's transport to jail and shortly after their arrival. As we will discuss *post*, Officer Wycinsky's testimony helped tip the section 352 scales.

Prosecutor: "What if anything happened during the transport of [defendant] to the jail?"

Officer Wycinsky: "He became very upset with me. Very angry, very threatening. Constantly threatening to hurt me, injure me. And then made a comment of he was going to look up my name on the [I]nternet and come out to my house and get me."

Prosecutor: "Okay. And when he was saying these things, was he doing anything physically that reflected he was agitated[?]"

Officer Wycinsky: "Um, you mean was he speaking like I am or is he yelling and screaming and—"

Prosecutor: "Yes. What was his demeanor?"

Officer Wycinsky: "He was very, very angry. Screaming, yelling, very— like in a very threatening manner. Not calm. Obviously not happy."

Prosecutor: "And when you arrived at the jail did his demeanor change at all?"

Officer Wycinsky: "No, it actually kind of escalated. During the intake process—we have kind of an area where we fill out paperwork, booking, process paperwork. And then we have a chair where we set them in. Mr. Hendrix—."

At that point, the court asked both counsel to approach the bench where an unreported bench conference took place. After going back on the record, the prosecutor indicated she had no further questions. Whatever was said during the bench conference was not later placed on the record. However, as earlier noted, on the day after its initial in limine ruling, the trial court had expressly precluded testimony about threats defendant made at the jail.

> b. *Trial testimony concerning the 1993 incident*

Alameda Police Officer Ronald Simmons testified regarding the 1993 incident. On September 18, 1993, at 12:51 a.m., Officer Simmons responded to a call regarding an intoxicated person "acting crazy." No evidence was introduced indicating the specific source of the call. Officer Simmons proceeded to the 3000 block of Main Street, a road that flanked the perimeter of the Alameda Naval Air Station. He was in his blue police uniform and driving a marked patrol car.

When Officer Simmons arrived on the scene, the "naval air security guards were out with [defendant] in the parking lot and they were *more or less* detaining him" until officers arrived. (Italics added.) According to Simmons,

the security guards were not employed by a separate company; they were "navy security police." The parking lot in which they were located is just outside the gate and is public property. Nothing was occurring between defendant and the naval security police upon Simmons's arrival. They were just standing there.

Officer Simmons parked and approached on foot. Officer Simmons noticed that defendant had a hard time standing up straight, had a strong odor of alcohol on his breath, and was drooling. Given defendant's impaired condition, Officer Simmons was concerned for defendant's safety in that particular area. Officer Simmons explained there were "a lot of fights, a lot of people getting robbed, [and] a lot of drunk people sometimes show up in that neighborhood" and "they get in fights with the sailors as they come on and off the base." Officer Simmons placed defendant under arrest for public intoxication. Simmons's intent was to take defendant to the police department "intoxication tank" so defendant could "sober up."

Officer Simmons, along with an "undercover officer," Officer Chuch, each grabbed one of defendant's arms. Defendant tried to pull his arms free from their hold. The officers responded with more force and were able to secure defendant's arms behind his back and handcuff him. Officer Simmons and Officer Chuch walked defendant to the police car. Defendant started to twist his body from side to side as if attempting to break loose. The officers held on tighter and continued to walk.

At the police car, defendant stood up straight and refused to enter. Officer Simmons and Officer Chuch tried to get defendant closer to the vehicle, but he remained erect. As the officers endeavored to get him in the car, defendant started kicking the officers. Another officer, Officer Smith, was also there at the time. The record does not reflect whether Officer Smith was a uniformed officer or another "undercover" officer. The officers were eventually able to get defendant into the police car.

### c. Stipulation regarding prior convictions

After the jury heard the testimony regarding the 2005 and 1993 incidents, the following stipulation was read into the record: "The defendant's conduct on September 18th, 1993, resulted in a conviction of Penal Code section 148, resisting or deterring an officer. [¶] The defendant's conduct on May 25th, 2005 resulted in a conviction of Penal Code section 69, resisting or deterring an officer by means of threat or violence."

## B. Defense Case

Stuart Cameron, a former police officer, testified as an expert witness. Cameron regularly trains police officers on the use of force. In the instructional context, Cameron has seen 80 students a year over the last five to eight years intentionally sprayed with pepper spray from a distance of three to five feet. Students are sprayed on the forehead or chest area. Direct sprays to the eyes are avoided because of the potential for eye damage.

According to Cameron, based on his experience and observations, pepper spray does not affect everyone in the same manner. On average, a person's vision is affected for 30 to 45 minutes after being sprayed with pepper spray. The pepper spray makes it more difficult to see. For people who have their eyes washed out after being sprayed, on average it takes about 30 minutes before they are able to "see without being blurred." Cameron opined that, depending on the person, pepper spray may have an enhanced or diminished effect on an individual who has consumed alcohol. Cameron further explained that pepper spray can cause an individual to have a runny nose, salivate, rub and/or close his or her eyes and occasionally cough.

## DISCUSSION

## I. The Knowledge Element in the Charged Offense

Penal Code section 69 requires actual knowledge on the part of the defendant that the person being resisted is an executive officer and that the officer is engaged in the performance of his/her duty. (Pen. Code, § 69;[5] see *People v. Rasmussen* (2010) 189 Cal.App.4th 1411, 1419, 1421 [117 Cal.Rptr.3d 588].) Accordingly, to establish defendant's guilt under Penal Code section 69, the prosecution was required to prove, among other things, that when defendant resisted Officer Mosley, defendant knew that he was dealing with a police officer and that he knew Officer Mosley was performing his duty.[6]

---

[5] At the time, Penal Code section 69 provided: "Every person who attempts, by means of any threat or violence, to deter or prevent an executive officer from performing any duty imposed upon such officer by law, *or who knowingly resists*, by the use of force or violence, *such officer, in the performance of his duty*, is punishable by a fine not exceeding ten thousand dollars ($10,000), or by imprisonment in the state prison, or in a county jail not exceeding one year, or by both such fine and imprisonment." (Italics added.) The term "executive officer" includes a police officer. (*In re Manuel G.* (1997) 16 Cal.4th 805, 818–819 [66 Cal.Rptr.2d 701, 941 P.2d 880].)

[6] The court also instructed on voluntary intoxication. That instruction read in pertinent part, "the People have the burden of proving beyond a reasonable doubt that the defendant acted with the knowledge that Luke Mos[]ley was a peace officer performing or attempting to perform his duties."

## II. Admissibility of Uncharged Offenses

■ As a general rule, evidence of uncharged crimes is inadmissible to prove the defendant had the propensity or disposition to commit the charged crime. (§ 1101, subd. (a); *People v. Lindberg* (2008) 45 Cal.4th 1, 22 [82 Cal.Rptr.3d 323, 190 P.3d 664] (*Lindberg*); *Ewoldt, supra*, 7 Cal.4th at p. 393.) "The reason for this rule is not that such evidence is never relevant; to the contrary, the evidence is excluded because it has too much probative value." (*People v. Guerrero* (1976) 16 Cal.3d 719, 724 [129 Cal.Rptr. 166, 548 P.2d 366]; accord, *People v. Schader* (1969) 71 Cal.2d 761, 773, fn. 6 [80 Cal.Rptr. 1, 457 P.2d 841].) " 'The natural and inevitable tendency' " is to give excessive weight to the prior conduct and either allow it to bear too strongly on the present charge, or to take the proof of it as justifying a conviction irrespective of guilt of the present charge. (*Guerrero, supra*, 16 Cal.3d at p. 724; *Schader, supra*, 71 Cal.2d at p. 773, fn. 6; see *People v. Ortiz* (2003) 109 Cal.App.4th 104, 111 [134 Cal.Rptr.2d 467] (*Ortiz*).)

Evidence of other crimes is admissible, however, when relevant for a noncharacter purpose—that is, when it is relevant to prove some fact other than the defendant's criminal disposition, such as "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake [of fact] or accident." (§ 1101, subd. (b); see *Lindberg, supra*, 45 Cal.4th at p. 22; *Ewoldt, supra*, 7 Cal.4th at p. 393.)

■ Although a prior criminal act may be relevant for a noncharacter purpose to prove some fact other than the defendant's criminal disposition, the probative value of that evidence may nevertheless be counterbalanced by a section 352 concern. Evidence may be excluded under section 352 if its probative value is "substantially outweighed by the probability that its admission [would] . . . create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

Thus, the admissibility of uncharged crimes depends upon three factors: (1) the materiality of the facts sought to be proved; (2) the tendency of the uncharged crimes to prove or disprove the material fact (i.e., probative value); and (3) the existence of any rule or policy requiring the exclusion of relevant evidence (i.e., prejudicial effect or other § 352 concern). (*Lindberg, supra*, 45 Cal.4th at p. 22; accord, *People v. Kelly* (2007) 42 Cal.4th 763, 783 [68 Cal.Rptr.3d 531, 171 P.3d 548] (*Kelly*); *People v. Thompson* (1980) 27 Cal.3d 303, 315 [165 Cal.Rptr. 289, 611 P.2d 883] (*Thompson*).).

Courts subject other crimes evidence to " 'extremely careful analysis' " (*Ewoldt, supra*, 7 Cal.4th at p. 404) and review the admission of such evidence for abuse of discretion (*Lindberg, supra*, 45 Cal.4th at p. 23).

"Action that transgresses the confines of the applicable principles of law is outside the scope of discretion and we call such action an 'abuse' of discretion. [Citation.]" (*City of Sacramento v. Drew* (1989) 207 Cal.App.3d 1287, 1297 [255 Cal.Rptr. 704]; accord, *Miyamoto v. Department of Motor Vehicles* (2009) 176 Cal.App.4th 1210, 1218–1219 [98 Cal.Rptr.3d 459] [court abused its discretion when it applied the wrong legal standard for evaluating the foundational requirements for the admissibility of evidence under § 1280]; *People v. Harris* (1998) 60 Cal.App.4th 727, 736 [70 Cal.Rptr.2d 689] [court abused its discretion in admitting evidence under § 1108].) Thus, "[t]o determine if a court abused its discretion, we must . . . consider 'the legal principles and policies that should have guided the court's actions.' [Citation.]" (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 773 [149 Cal.Rptr.3d 614, 288 P.3d 1237].)

We conclude that the trial court's legal analysis here was erroneous. The error is understandable because this case presents a significantly different context for the application of the decisional law related to section 1101, subdivision (b). We have found no section 1101, subdivision (b) cases involving prior resisting arrest incidents admitted for purposes of establishing the knowledge element of a resisting charge or establishing the absence of mistake. Nor have we found any cases addressing the application of the similarity analysis in deciding the admissibility of other crimes evidence to establish knowledge.

We conclude that probative value in the context of the evidence in this case turns on the similarity of the prior incidents. The trial court erred by not considering similarity, and because the prior crimes were dissimilar in a material way, they lacked probative value. The other crimes evidence lacked probative value for a second reason—it was cumulative, in that it established what is commonly held knowledge. Further, the evidence of the postarrest conduct in the 2005 incident lacked any relevancy. Moreover, whatever probative value evidence these incidents had was substantially outweighed by section 352 prejudice, particularly in light of the testimony concerning the postarrest events in the 2005 incident.

## A.  Material Purpose

In order to satisfy the requirement of materiality, the fact sought to be proved or disproved must be either an ultimate fact or an intermediate fact from which such ultimate fact may be inferred. (*Thompson, supra,* 27 Cal.3d at p. 315.) Elements of the offense and defenses are ultimate facts. (*Id.* at p. 315, fn. 13.) The absence of mistake is an intermediate fact. (See *Thompson, supra,* at p. 315, fn. 14 ["Motive, opportunity, plan, scheme, design, and modus operandi are examples of intermediate facts."].) By pleading not guilty

to violating Penal Code section 69, defendant placed all elements of the crime in dispute. (*Lindberg, supra*, 45 Cal.4th at p. 23; *People v. Balcom* (1994) 7 Cal.4th 414, 422 [27 Cal.Rptr.2d 666, 867 P.2d 777] (*Balcom*).)

The People offered the 1993 and 2005 incidents for the noncharacter purpose of establishing defendant's knowledge that Officer Mosley was a police officer performing his duty, an ultimate fact, and to establish absence of mistake, an intermediate fact.[7] And the defense put defendant's knowledge in active dispute by asserting lack of knowledge and mistake of fact as defenses to the charges. Ultimately, the defense argued to the jury that defendant may have believed he was dealing with security guards, who he had reason to believe were after him, and not police officers. This was so, according to the defense, because defendant was unable to see after being pepper sprayed twice, he was intoxicated and the lighting conditions were poor. For these reasons, both knowledge and mistake of fact were material issues in the case.

## B.   Relevance and Probative Value

■   It is well settled that various degrees of similarity are required to establish identity, common scheme or plan and *intent*. "When the prosecution seeks to prove the defendant's identity as the perpetrator of the charged offense with evidence he had committed uncharged offenses, the admissibility of evidence of the uncharged offenses turns on proof that the charged and uncharged offenses share sufficient distinctive common features to raise an inference of identity. A lesser degree of similarity is required to establish the

---

[7] For the first time, the People suggest on appeal that defendant's prior incidents were not only relevant to the material issues of knowledge and mistake of fact, but also relevant to the issue of defendant's credibility. However, defendant did not testify and his credibility was not at issue. The People also suggest, for the first time, that the prior incidents were relevant to show defendant "intended to resist the officer." However, an "intent to resist" is not an element of Penal Code section 69. What matters is whether defendant *knowingly resisted an executive officer*, not whether he intentionally resisted somebody who turned out to be an executive officer. Although not argued by the People, we recognize that *willful* resistance is an element of Penal Code section 148, resisting a peace officer, a lesser included offense upon which the jury was instructed. However, if the jury found that defendant committed the act alleged, there could be no reasonable dispute that he did it intentionally or willfully, and evidence of the prior incidents would be merely cumulative on that issue. (See *Balcom, supra*, 7 Cal.4th at pp. 422–423.) Consequently, we reject the People's belated arguments justifying the admission of the prior incidents.

We also note that the prosecutor offered another theory at trial—namely, that the other crimes evidence was admissible to rebut self-defense. The trial court did not expressly rule on whether the evidence was also admissible to rebut any implication of self-defense and the prosecutor did not press the issue any further. On appeal, the People have not argued that the prior crimes were admissible to rebut any implication of self-defense. Accordingly, we deem this theory abandoned. (Cf. *Ellenberger v. Espinosa* (1994) 30 Cal.App.4th 943, 948 [36 Cal.Rptr.2d 360].)

existence of a common plan or scheme and still less similarity is required to establish intent. [Citations.] In order to be admissible to prove intent, the uncharged misconduct must be sufficiently similar to the charged offense to support the inference that the defendant probably acted with the same intent in each instance. [Citations.]" (*Lindberg, supra*, 45 Cal.4th at p. 23, citing *Ewoldt, supra*, 7 Cal.4th at pp. 402–403.) However, we find no California case that discusses whether similarity is required to prove knowledge, and if so, what degree of similarity is required. We address those issues here.

Whether similarity is required to prove knowledge and the degree of similarity required depends on the specific knowledge at issue and whether the prior experience tends to prove the knowledge defendant is said to have had in mind at the time of the crime. For example, knowledge of the dangers of driving while under the influence can be obtained through the general experience of having suffered a driving under the influence (DUI) conviction (*People v. Brogna* (1988) 202 Cal.App.3d 700, 709 [248 Cal.Rptr. 761]), from the knowledge obtained in DUI classes (*People v. Garcia* (1995) 41 Cal.App.4th 1832, 1848–1850 [50 Cal.Rptr.2d 127], disapproved on other grounds in *People v. Sanchez* (2001) 24 Cal.4th 983, 991, fn. 3 [103 Cal.Rptr.2d 698, 16 P.3d 118]; *People v. Murray* (1990) 225 Cal.App.3d 734, 746 [275 Cal.Rptr. 498]; *People v. McCarnes* (1986) 179 Cal.App.3d 525, 532 [224 Cal.Rptr. 846]) or from the admonition required by Vehicle Code section 23593[8] upon a DUI-related conviction. While prior similar driving conduct and other similar circumstances would enhance the probative value, other crimes evidence may be admissible even though similar only in a general way, i.e., the prior events involve prior DUI offenses. This is so because in any of these examples, the evidence supports an inference that the defendant was aware of the dangers of driving while under the influence at later times when he or she drove. Also, as the prosecutor pointed out here, in narcotics prosecutions, evidence of prior drug convictions is relevant to prove knowledge of the narcotic nature of the substance. (*People v. Williams* (2009) 170 Cal.App.4th 587, 607 [88 Cal.Rptr.3d 401] (*Williams*); *People v. Thornton* (2000) 85 Cal.App.4th 44, 49–50 [101 Cal.Rptr.2d 825].) On this theory, the only necessary similarity is that the controlled substance be the same. (But see *U.S. v. Vo* (9th Cir. 2005) 413 F.3d 1010, 1017–1019 [evidence of a prior cocaine trafficking conviction admissible in methamphetamine trafficking

---

[8] Vehicle Code section 23593, subdivision (a) provides: "(a) The court shall advise a person convicted of a violation of Section 23103, as specified in Section 23103.5, or a violation of Section 23152 or 23153, as follows: [¶] 'You are hereby advised that being under the influence of alcohol or drugs, or both, impairs your ability to safely operate a motor vehicle. Therefore, it is extremely dangerous to human life to drive while under the influence of alcohol or drugs, or both. If you continue to drive while under the influence of alcohol or drugs, or both, and, as a result of that driving, someone is killed, you can be charged with murder.' "

case to establish intent, knowledge and absence of mistake because the evidence showed that defendant had a familiarity with drug trafficking in general].)[9]

Here, as in the aforementioned examples, the prosecution's knowledge theory was based on an inference that defendant learned from his prior experiences. In the abstract, the theory is sound. People learn from their experiences. Even when those experiences occurred long ago, the knowledge gained from such experiences can be retained and recalled in the future.

■ However, as the trial court correctly noted, on the facts of this case, knowledge and mistake of fact "are very closely intertwined." Stated differently, the knowledge element is akin to absence of mistake. Defendant contends he did not have the requisite knowledge—the knowledge that Mosley was a police officer—because he was mistaken. The theories advanced in this case are also akin to establishing criminal intent or rebutting a claim of innocent intent. When the knowledge element is akin to absence of mistake or innocent intent, an inference that defendant learned from his experiences and obtained information that establishes the requisite knowledge requires that the previous experiences be similar to the circumstances presented in the charged case. As our high court has noted, " '[T]he recurrence of a similar result . . . tends (increasingly with each instance) *to negative accident or inadvertence . . . or good faith or other innocent mental state*, and tends to establish (provisionally, at least, though not certainly) the presence of the normal, i.e., criminal, intent accompanying such an act . . . .' [Citation.] In order to be admissible to prove intent, the uncharged misconduct must be sufficiently similar to support the inference that the defendant ' "probably harbor[ed] the same intent in each instance." [Citations.]' " (*Ewoldt, supra,* 7 Cal.4th at p. 402, italics added; see *U.S. v. Miller* (9th Cir. 1989) 874 F.2d 1255, 1269 ["when prior crimes are used to establish '. . . absence of mistake or accident,' such evidence simply lacks probative value unless it is sufficiently similar to the subsequent offense"]; 1 Imwinkelried, Uncharged Misconduct Evidence (rev. ed. 2009) § 5:33, pp. 99–100.) Likewise, to establish knowledge when that element is akin to absence of mistake, the uncharged events must be sufficiently similar to the circumstances of the

---

[9] We do not attempt to catalog here every circumstance where the only similarity is the general nature of the offense. Nor do we hold that to establish knowledge under section 1101, subdivision (b), the nature of the prior offense must be the same offense for which defendant is charged. Indeed, we note it has been held that prior incidents of DUI and reckless driving are relevant to prove implied malice in a vehicular murder prosecution not involving alcohol or other inebriants. (*People v. Moore* (2010) 187 Cal.App.4th 937, 943 [114 Cal.Rptr.3d 540] [jury could reasonably conclude that the defendant's prior DUI conviction put him on notice of the consequences of driving with extreme recklessness]; *Ortiz, supra,* 109 Cal.App.4th at p. 116.)

charged offense to support the inference that what defendant learned from the prior experience provided the relevant knowledge in the current offense.

Because the factual issue the jury was tasked to resolve here was whether defendant knew Officer Mosley was a police officer or whether defendant mistakenly thought Officer Mosley was another security guard, the admissibility of the uncharged offenses turns on whether the experiences defendant gained during those prior incidents prepared him to distinguish between security guards and the police. On this theory, the prior incidents would be probative if the circumstances under which defendant encountered the police on those prior occasions involved interaction with security guards. Indeed, we regard this as a crucial point of similarity here. (See *People v. Jones* (2011) 51 Cal.4th 346, 371 [121 Cal.Rptr.3d 1, 247 P.3d 82] [prior robberies were not particularly similar to charged offense but for one "crucial point of similarity," defendant's intent to steal from victims whom defendant selected].) For example, had the two previous encounters with uniformed police officers involved situations where the police issued commands and used force to detain defendant *after* defendant had been initially confronted by private security guards, it could be inferred that defendant learned from those experiences that the police become involved after an escalating confrontation with private security personnel, and because defendant knew that, it was less likely he mistook the police here for security officers. However, the prior incidents here provide no such analogue.

In assessing the trial court's evidentiary ruling, we must consider the facts known to the court at the time the ruling was made. (*People v. Hartsch* (2010) 49 Cal.4th 472, 491 [110 Cal.Rptr.3d 673, 232 P.3d 663]; *People v. Hernandez* (1999) 71 Cal.App.4th 417, 425 [83 Cal.Rptr.2d 747].) Consequently, we look to the prosecution's offers of proof in determining error. We shall discuss the trial evidence in our harmless error analysis.

The offer of proof for the 2005 event indicated that the only involvement by security personnel was as witnesses to a domestic violence incident between defendant's sister and her boyfriend, in which defendant was somehow involved. The offer of proof did not establish that the security guards were involved with defendant or that defendant was even aware of their presence. Thus, it cannot be inferred from the evidence proffered by the prosecutor that this prior experience provided defendant with the knowledge relevant here. Nor does the prosecutor's offer of proof tend to prove absence of mistake.

As for the 1993 incident, no mention whatsoever was made of security personnel in the prosecution's offer of proof. Thus, this crucial point of similarity was absent from the offer of proof and it cannot be inferred from

the proffered evidence that defendant gained experience that established the relevant knowledge or absence of mistake here.

■ Our high court has repeatedly noted that the probative value of other crimes evidence must be substantial. " 'Since "substantial prejudicial effect [is] inherent in [such] evidence," uncharged offenses are admissible only if they have *substantial* probative value.' " (*Ewoldt, supra*, 7 Cal.4th at p. 404, quoting *Thompson, supra*, 27 Cal.3d at p. 318, italics in *Thompson*; accord, *Lindberg, supra*, 45 Cal.4th at p. 23; *Kelly, supra*, 42 Cal.4th at p. 783; *Balcom, supra*, 7 Cal.4th at p. 422.) "If there is any doubt, the evidence should be excluded." (*Thompson, supra*, 27 Cal.3d at p. 318; accord, *People v. Leon* (2008) 161 Cal.App.4th 149, 168 [73 Cal.Rptr.3d 786].) The "principal factor" affecting the probative value of the evidence of defendant's uncharged offenses is the tendency of that evidence to demonstrate defendant's knowledge and refute mistake of fact in the circumstances of this case. (See *Ewoldt, supra*, 7 Cal.4th at p. 404 ["The principal factor affecting the probative value of the evidence of defendant's uncharged offenses is the tendency of that evidence to demonstrate the existence of a common design or plan."].) As can be seen, without a greater similarity, the tendency to do so here is weak.

We conclude that the proffered evidence concerning the 1993 and 2005 incidents lacked probative value given the lack of similarity. However, our evaluation of probative value here does not end with our similarity analysis. We consider another factor.

In determining probative value, courts also look to whether the evidence of other offenses is cumulative. If the other crimes evidence is merely cumulative of other evidence, then the probative value of the other crimes evidence is diminished. For example, in *Balcom*, the defendant was charged with burglary, robbery and rape. (*Balcom, supra*, 7 Cal.4th at p. 418.) On the issue of the admissibility of an uncharged robbery/rape incident to establish intent, our high court stated, "because the victim's testimony that defendant placed a gun to her head, if believed, constitutes compelling evidence of defendant's intent, evidence of defendant's uncharged similar offenses would be merely cumulative on this issue." (*Balcom, supra*, 7 Cal.4th at p. 423.)

Here, the police-related knowledge defendant purportedly gained and retained from the 1993 and 2005 incidents is common knowledge. Thus, in a sense, it is cumulative. That, in the course of duty, police officers give verbal commands, use force when trying to arrest a noncompliant individual, and attempt to place an individual's arms behind his or her back for handcuffing, are rudimentary concepts. It is reasonable to assume that defendant, a grown male, had a grasp of this basic knowledge regardless of whether he had previous encounters with law enforcement. Indeed, during closing argument,

the prosecutor argued, "we've all seen t.v., all of the cop shows. We know when cops give commands, it's [c]ome out with your hands up, . . . Show us your hands, we're all familiar with those commands."

It is true, as our dissenting colleague notes, that defendant had these experiences "up close and personal." But it is still the case that the knowledge defendant is said to have obtained is common knowledge. There was no need for the jury to hear inherently prejudicial other crimes evidence that evinced a propensity of violence toward the police to demonstrate defendant's familiarity with common sense, widely understood concepts.

Lastly, on the issue of probative value, specific discussion about the evidence related to defendant's postarrest conduct in the 2005 incident is warranted. In the offer of proof, the prosecutor indicated defendant "repeatedly threatened" Officer Wycinski during the transportation from the scene of the 2005 arrest. Defendant told the officer he would look up the officer's address on the Internet and "come 'get him.'" The trial court did not elaborate on how this specific evidence tends to establish knowledge or the absence of mistake in the current case and we do not see how it does.[10] "'[I]f the connection between the uncharged offense and the ultimate fact in dispute is not clear, the evidence should be excluded.' [Citation.]" (*People v. Daniels* (1991) 52 Cal.3d 815, 856 [277 Cal.Rptr. 122, 802 P.2d 906]; accord, *People v. Spector* (2011) 194 Cal.App.4th 1335, 1373 [127 Cal.Rptr.3d 31, 128 Cal.Rptr.3d 31].) We conclude there is nothing in the 2005 postarrest verbal threats that bore on the issue of whether defendant knew Officer Mosley was a police officer and not another private security guard. Indeed, the trial court correctly excluded other postarrest evidence related to both the 1993 and 2005 incidents, as well as the entirety of the evidence of three other incidents, all of which involved postarrest conduct.

As we have noted, the prosecutor suggested during the in limine hearing that the "underlying assertion" of defendant's mistake of fact defense was that defendant would not have acted the way he did if he had known it was the police with whom he was dealing. Based on this, the prosecutor contended the proffered evidence was probative and "it would be unfair for the jury not to be able to consider this evidence." First, it is telling that the People apparently have abandoned this argument, as they do not advance it on appeal. Second, we view the inference the prosecutor sought to draw as it may have related to the 2005 postarrest conduct as weak, at best. Whether defendant acted badly after realizing the police had arrested him hardly

---

[10] This evidence may have been admissible in a prosecution of the 2005 charges as evidence of resisting. However, there was no need to establish that defendant actually resisted the police during that incident here, because the parties stipulated he had sustained a conviction related to that conduct.

establishes that he knew it was the police who attempted to detain him at the scene. Third, the prosecutor's argument was easily made without evidence of the 2005 postarrest conduct because evidence of belligerent postarrest behavior related to the charged event was going to be introduced over defendant's in limine objection. Thus, evidence that defendant made threats against a police officer after his arrest in 2005 was not only irrelevant, but it was also unnecessarily cumulative, and as we shall discuss, unduly prejudicial.

## C. Prejudicial Effect

■ Not only must the probative value of other crimes evidence be substantial, but the probative value must not be substantially outweighed by the probability that its admission would create a serious danger of undue prejudice under section 352. (*People v. Kipp* (1998) 18 Cal.4th 349, 371 [75 Cal.Rptr.2d 716, 956 P.2d 1169].) " 'Evidence is prejudicial within the meaning of Evidence Code section 352 if it " 'uniquely tends to evoke an emotional bias against a party as an individual' " [citation] or if it would cause the jury to " ' "prejudg[e]" a person or cause on the basis of extraneous factors' " [citation].' [Citation.] . . . 'As Wigmore notes, admission of this evidence produces an "over-strong tendency to believe the defendant guilty of the charge merely because he is a likely person to do such acts." [Citation.] It breeds a "tendency to condemn, not because he is believed guilty of the present charge, but because he has escaped unpunished from other offenses . . . ." [Citation.] Moreover, "the jury might be unable to identify with a defendant of offensive character, and hence tend to disbelieve the evidence in his favor." [Citation.]' " (*People v. Foster* (2010) 50 Cal.4th 1301, 1331 [117 Cal.Rptr.3d 658, 242 P.3d 105] (*Foster*).) Here, because there was little, if any, probative value to the other crimes evidence, and because the tendency to condemn based on the proffered evidence was high, we conclude that whatever probative value the 1993 and 2005 incidents had was substantially outweighed by the prejudicial propensity effect of that evidence.

Furthermore, the 2005 postarrest evidence added significantly to the prejudice side of the section 352 scale. In determining whether other crimes evidence is prejudicial, one factor courts look to is whether that evidence is inflammatory, i.e., whether the evidence is likely to inflame the jury's passions. (*Ewoldt, supra*, 7 Cal.4th at p. 405; *Ortiz, supra*, 109 Cal.App.4th at p. 118.)

Here, the proffered evidence concerning defendant's postarrest threats on Officer Wycinsky's life during the 2005 incident was not only irrelevant, but inflammatory. There was a substantial danger the jury would use that irrelevant evidence as evidence suggesting not only did defendant have the propensity to be an aggressive, violent and offensive drunkard, but he also had a particular propensity of violence toward the police.

■ The People point out that "highly probative evidence" should not be excluded "unless the undue prejudice is unusually great." (*People v. Walker* (2006) 139 Cal.App.4th 782, 806 [43 Cal.Rptr.3d 257].) We agree. But as we have seen, the evidence here lacked probative value and was unduly prejudicial.

■ As part of the section 352 prejudice analysis, courts consider whether the trial court gave a limiting instruction. A limiting instruction can ameliorate section 352 prejudice by eliminating the danger the jury could consider the evidence for an improper purpose. (*Foster, supra*, 50 Cal.4th at p. 1332 ["the jury was instructed not to consider the evidence to prove that defendant was a person of bad character, thereby 'minimizing the potential for improper use' "]; *Lindberg, supra*, 45 Cal.4th at p. 26 [instructions eliminated any danger " 'of confusing the issues, or of misleading the jury' "]; see *Lindberg*, at p. 25; *Ortiz, supra*, 109 Cal.App.4th at p. 118 [limiting instruction "further reduced the potential for any untoward effects of the evidence"].) We recognize that the trial court gave the standard limiting instruction, CALCRIM No. 375,[11] telling the jury that it could, but was not required to, consider the other crimes evidence for the limited purpose of determining the knowledge element or whether defendant's actions were the result of mistake or accident, and also that the jury could not conclude from the evidence that defendant has a bad character or is disposed to commit crime. But the trial court also included the optional bracketed material in the standard instruction, which explained that in evaluating the other crimes evidence, the jury should "consider the similarity or lack of similarity between the uncharged offenses and the charged offense." The standard

---

[11] In pertinent part, the court instructed the jury concerning the 1993 and 2005 incidents as follows:

"The People presented evidence that the defendant committed other offenses of resisting by use of force or violence, a peace officer, in the performance of duty in 2005 and Resisting, Obstructing or Delaying a Peace Officer in the Performance of Duties in 1993. None of this conduct was charged in the case before you. [¶] . . . [¶]

"If you decide that the defendant committed the offenses, you may, but are not required to, consider that evidence for the limited purpose of deciding whether or not:

"The defendant knew that Luke Mos[]ley was a peace officer performing his duties when defendant allegedly acted in this case; or

"The defendant's alleged actions were the result of mistake or accident.

"*In evaluating this evidence, consider the similarity or lack of similarity between the uncharged offenses and the charged offense.*

"Do not consider this evidence for any other purpose.

"Do not conclude from this evidence that the defendant has a bad character or is disposed to commit crime.

"If you conclude that the defendant committed the uncharged offenses, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of the crime of Resisting by Use of Force or Violence Luke Mos[]ley in the Performance of his Duty charged in the Information. The People must still prove the charge beyond a reasonable doubt." (Italics added.)

instruction does not explain how similarity should be considered or what consideration, if any, a jury should give the evidence if it finds it dissimilar. Thus, in the context of this case, the instruction was confusing. Moreover, in light of the irrelevant and inflammatory evidence that did not establish knowledge or refute mistake of fact, but rather only showed a propensity to act out violently toward the police, we cannot see how the jury could understand the parameters of the limiting language in the instruction. Thus, we cannot presume the jury understood and followed that instruction. (See *Williams, supra*, 170 Cal.App.4th at p. 607.) Nor can we say that the instruction eliminated the danger of or even minimized or reduced the potential for improper use of the other crimes evidence.[12]

We conclude that any probative value the other crimes evidence had was substantially outweighed by its prejudicial effect.

### III. Harmless Error

Defendant argues that the error in admitting the 1993 and 2005 incidents was not harmless.[13] We must reverse if, " 'after an examination of the entire cause,' " we conclude it is "reasonably probable" that a result more favorable to defendant would have resulted had the prior crimes evidence not been admitted. (*People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243] (*Watson*).) We conclude the error was not harmless in this case.

Because we must determine whether the error is harmless by examining the " 'entire cause,' " we first consider the trial evidence concerning the other crimes evidence. That evidence was different from the evidence the prosecutor proffered in the in limine offer of proof. If the trial evidence reflects sufficient similarity—thereby enhancing the probative value of the other crimes evidence—that evidence could contribute to a conclusion that the trial court's in limine ruling based on the deficient offer of proof was harmless. (See *People v. Turner* (1984) 37 Cal.3d 302, 312 [208 Cal.Rptr. 196, 690 P.2d 669], overruled on other grounds in *People v. Anderson* (1987) 43 Cal.3d 1104, 1115 [240 Cal.Rptr. 585, 742 P.2d 1306] [holding that review of a trial

---

[12] Nor is this a case where the prosecutor's argument clarified the application of the instruction. The prosecutor did not comment on similarities or any other circumstances related to the other crimes that purportedly showed defendant's knowledge or lack of mistake. Nor did the prosecutor remind the jury of the limited purpose for which the evidence was admitted or the prohibition against using the evidence as evidence of propensity. (See *Foster, supra*, 50 Cal.4th at pp. 1334–1335 [prosecutor told the jury " 'just the fact that he commits the crime, these kind of crimes in this particular way, well, that of course doesn't mean he did this one. If that's all the evidence we had, we wouldn't be here, correct? But that isn't all the evidence that we have.' "].)

[13] The People do not address in their appellate briefing whether any error in admitting the prior crimes evidence was harmless.

court's ruling on a severance motion for abuse of discretion must be made on facts as they appeared at the time of the hearing on the motion, but "what transpires at trial determines the prejudicial effect of [the] ruling"].)

While the offer of proof of the 2005 incident showed no involvement by a security guard, the evidence the jury heard established that a security guard became involved. But that involvement occurred only after defendant's struggle with the police was well underway. At that point, the security guard pepper sprayed defendant. There is nothing in the trial evidence that suggests defendant was aware a security guard was involved as he struggled with the police on the ground at the time he was pepper sprayed. Thus, even considering the evidence the jury actually heard, it cannot be inferred that defendant learned how to differentiate between private security guards and the police in situations following a confrontation with a security guard.

As for the 1993 incident, "navy security police" were standing with defendant and "more or less" had him detained when the police arrived on the scene. The evidence indicates that the security personnel were not private security officers, but rather Navy personnel. There is no evidence how these individuals were dressed. The evidence does not disclose what occurred during any earlier encounter leading to what the responding officer described as "more or less" a detention, let alone provide a description of what the Navy security police did to "more or less" detain defendant. Indeed, when the responding officer arrived, he observed that defendant and the Navy personnel were simply standing in the public parking lot. Defendant had not been handcuffed at that point. And it was the responding officer's intention to detain defendant only because he was a danger to himself given his intoxication and the location, not because of any confrontation defendant had with the security personnel. There is no evidence the Navy security police attempted to subdue defendant and then called for the assistance of the police. Thus, even when considering the trial evidence, it cannot be inferred from the 1993 incident that defendant gained experience that established the relevant knowledge or absence of mistake in the instant case.

Consequently, we conclude that the trial evidence established insufficient similarity to enhance the probative value to a point that the other crimes evidence was not substantially outweighed by its prejudicial effect.[14] Thus, the trial evidence does not contribute to a finding that admission of the other crimes evidence was harmless.

We next consider what impact the prosecutor's argument may have had on the prejudice resulting from the other crimes evidence. For purposes of

---

[14] Indeed, our review of the trial evidence reveals significant dissimilarities that detract from the probative value. (See *Balcom, supra,* 7 Cal.4th at p. 427 [recognizing that probative value can be decreased by "dissimilarities between the uncharged and the charged offenses"].)

determining whether the error was harmless, we may consider whether the prejudicial effect is reduced by a prosecutor's closing argument. (See *People v. Miller* (1963) 211 Cal.App.2d 569, 577 [27 Cal.Rptr. 290] ["We feel that the effect of any impropriety [of questions asked by the prosecutor on cross-examination of defendant] was cured by the statement of the district attorney in his argument to the jury."]; see *id.* at p. 576; *People v. Reingold* (1948) 87 Cal.App.2d 382, 414 [197 P.2d 175] ["Any doubt as to the prejudicial effect of the court's ruling admitting [the evidence] is at once removed when consideration is given to the use to which such evidence was put by the deputy district attorney in his argument to the jury."]; see also *People v. Maurer* (1995) 32 Cal.App.4th 1121, 1130 [38 Cal.Rptr.2d 335] [the prosecutor's "[c]losing arguments to the jury can be a relevant consideration in the prejudice equation" related to determining whether instructional error is harmless].)

Conversely, we may consider whether a prosecutor's closing argument to the jury exacerbated the prejudicial effect. Any meaningful assessment of prejudice must proceed in the light of the entire record, including how the evidence was used. (*People v. Powell* (1967) 67 Cal.2d 32, 54–55 [59 Cal.Rptr. 817, 429 P.2d 137]; *People v. Gonzales* (1967) 66 Cal.2d 482, 493 [58 Cal.Rptr. 361, 426 P.2d 929].)

In the prosecutor's opening closing argument, the prosecutor only briefly mentioned the 1993 and 2005 incidents and did not discuss the details. The prosecutor told the jury: "[H]e continues to be uncooperative [and] profane all the way through the time he's transported and booked. [¶] And then—and this is why you can—we brought in evidence from the 1993 and the 2005 events. Those were the last three officers. And I don't know if that got confusing. But those were two separate events that happened in the past. They're not charged in this case. But the law allows you to consider those [offenses] when you're asking in this case, Did the defendant know he was dealing with police officers performing their duties. [¶] Well, let me think about this: I can consider these other scenarios, these other things that happened in the past when the defendant was dealing with officers." While not helpful in explaining how the jury could "consider these other scenarios," the effect of this discussion on prejudice could be viewed as neutral.

However, comments the prosecutor made to the jury during the rebuttal argument added to the prejudicial effect of the other crimes evidence. The prosecutor told the jury, "[Defense counsel is] asking you to believe the defendant didn't know he was dealing with officers. [¶] The underlying argument there is, because if he knew he was dealing with officers, he wouldn't have acted like that. [¶] We know that's not true. [¶] *We know that after, he's clearly dealing with officers because he's arrested, handcuffed and*

*put in a patrol car and he continues to act the same way.* [¶] We know that when Mr. [*sic*] Martinez moves him from one car to another and transports him, he continues to act the same way. [¶] *We know that he acted the same way in 1993. We know that he acted the same way in 2005.*" (Italics added.) As we noted in our discussion of probative value, *ante*, the knowledge inference the prosecutor sought to draw with defendant's postarrest conduct was weak. Moreover, as can be seen, despite the trial court's *two* rulings expressly excluding defendant's 1993 postarrest conduct, the prosecutor told the jury, "*We know* that he acted the same way in 1993" (italics added) and then followed with the statement that he acted the same way in 2005. We conclude that this argument—the reference to excluded 1993 postarrest conduct and reference to the inflammatory 2005 postarrest conduct—had the effect of advancing the notion that defendant has a propensity to act violently with the police. Essentially, the jury was told defendant acted violently toward the police after his arrest twice before and he did it again here, and the argument did not advance the theory that defendant acted with the requisite knowledge or in the absence of mistake.

We next look to the trial evidence regarding the charged event. While there was evidence tending to establish defendant's knowledge that Officer Mosley was a police officer and not one of McCall's fellow security officers, that evidence was not overwhelming. The incident occurred at night under artificial light. The security guards were wearing black uniforms, whereas the police were in dark blue uniforms, and there was no testimony that the light was sufficient to allow anyone who was present to distinguish between the two colors. The evidence indicated that at some level the pepper spray was, indeed, effective on defendant. Defendant "grabbed his eyes" and rubbed them as he walked away from the security guard the first time he was sprayed—a spray that hit defendant directly in the eyes. The security guard's own vision was impaired both times he deployed the pepper spray. Having been located by the security guard after the first encounter, defendant knew his movements were being tracked by private security personnel and it was reasonable for him to have expected them to continue to look for him after the second encounter.

None of the police officers involved remembered whether they verbally identified themselves as police, and two of them testified that they did not write that they had done so in their written reports. The third officer, Officer Khang, was not asked whether she included that information in her report. However, there was evidence that she did write a report, and if she had included information indicating that she or the other officers identified themselves as police in her report, it seems reasonable the report would have been used to refresh her recollection when she testified at the first trial. (See § 771.) When the officers arrived, they did not have their vehicle emergency lights flashing or their sirens on, and there is no evidence defendant was ever

in a position to see the parked patrol vehicles. Although the security guard had had prior contacts with defendant, and although he indicated he worked with Sacramento Police "pretty much all of the time" at Countrywood, there was no evidence defendant knew the security company worked with Sacramento police officers there.

Defendant was intoxicated and incoherent. This was evidenced by the incoherent gibberish he spoke at the garbage enclosure and his nonsensical postarrest statement, "I ain't no citizen anymore. Revoke my citizenship."

The evidence concerning defendant's conduct relative to his opportunity to view the officers at the garbage enclosure was inconsistent. This inconsistency detracted from the strength of the prosecution's case. While Officer Landberg testified defendant assumed a bladed stance and "stared" at the officers for five to seven seconds before he fled, the other officers testified that, before defendant fled, he was pacing in circles, sometimes looking in their direction and sometimes looking away from them. Officer Mosley said defendant looked in their direction only "a couple of seconds" just before he fled. Neither Mosley nor Khang said defendant assumed a bladed stance and stared at them before fleeing.

The evidence concerning what occurred in the moments just before Officer Mosley and defendant became physically engaged was also inconsistent. The inconsistency here also detracted from the strength of the prosecution's case. While Officer Mosley testified that defendant got up after tripping, faced Officer Mosley and at the same time took a bladed stance, Officer Khang testified that she observed defendant run into a minivan and then saw Mosley immediately run into defendant. Officer Khang's account suggests defendant had virtually no opportunity to focus in on Mosley and his uniform at that moment. Even under Officer Mosley's account, the intoxicated and incoherent defendant had only a few moments to focus on Officer Mosley's uniform before the officer, who was still running at "full speed," collided into him.

On the other hand, as we have discussed, the irrelevant and nonprobative other crimes evidence the jury heard was undoubtedly prejudicial and the prejudice was intensified by how the prosecutor used the evidence in closing argument.

Our dissenting colleague finds no reasonable probability that a result more favorable to defendant would have been reached had the jury not heard the other crimes evidence. We find "at least such an equal balance of reasonable probabilities as to leave [us] in serious doubt as to whether the error has affected the result. But the fact that there exists at least such an equal balance of reasonable probabilities necessarily means [we must be] of the opinion

'that it is reasonably probable that a result more favorable to [defendant] would have been reached in the absence of the error.' " (*Watson, supra*, 46 Cal.2d at p. 837.) We so conclude and consequently, we reverse.[15]

### DISPOSITION

We reverse the judgment of conviction.

Hull, J., concurred.

**NICHOLSON, Acting P. J.,** Dissenting.—I respectfully disagree that the prior crimes evidence was improperly admitted and that such admission was prejudicial.

When we review a trial court's ruling concerning admission of evidence, we consider only the evidence before the court when it made its ruling. (*People v. Hartsch* (2010) 49 Cal.4th 472, 491 [110 Cal.Rptr.3d 673, 232 P.3d 663].) Here, the trial court ruled on the pretrial motion relying on the prosecution's offer of proof. Since those were the facts before the trial court when it made its ruling, any other facts developed at trial were and are immaterial to the trial court's ruling.

As noted by the majority, the offer of proof concerning the two prior crimes was as follows:

"On May 25, 2005, security guards witnessed domestic violence occurring between Corvette Hendrix, the Defendant's sister, and her boyfriend. The Defendant then got involved. SPD Officer Mueller attempted to detain him, but he violently resisted. When he was being transported to jail, he repeatedly threatened the [*sic*] SPD Officer Wycinski who was driving. He asserted that he would look up the officer's address on the [I]nternet, and come 'get him.' At the station, he yelled, 'You better change your beat.' "

"On September 18, 1993, Alameda Police Officer Simmons responded to reports of an intoxicated person causing a disturbance. He contacted the Defendant, who was displaying objective signs of intoxication. The Defendant passively resisted as Officer Simmons placed handcuffs on him. The Defendant tried to wriggle out of the officer's hold as they walked to the police car. He then refused to get into the vehicle. He kicked at another officer who was trying to assist. Once placed in the car, he lied [*sic*] on his back and moved his hands to the front of his body. He kicked the patrol [car]

---

[15] In light of our conclusion, we do not address defendant's additional argument that admission of the prior crimes evidence violated his federal due process rights.

door. Officer Simmons removed the Defendant from the patrol car, and the Defendant started to struggle again. The deputies placed him back in the patrol car, this time with a hobble, but the Defendant ripped it from his feet. When Officer Simmons tried to replace it, the Defendant spit in his face. The Defendant was finally transported to a holding cell. He hit, kicked and tried to ram the door with his body. He also tried to cover the camera in the cell."

These past circumstances gave defendant experience, closeup and personal, with police officers. He was able to observe them, and he learned that they would use physical force on his body to detain him. In one instance, there was also a security guard present before the police officers arrived, and defendant learned that, when situations escalate with a security guard present, police officers tend to arrive and take control. Defendant's experience surpassed that of most people who have no close contact with security guards and police officers. Since these past experiences resulted in opportunities for defendant to know how to distinguish between security guards and police officers, they were highly relevant to the main point of contention at trial—that is, whether defendant knew that he was resisting a police officer.

In my opinion, this was sufficient to sustain the trial court's exercise of discretion. This probative value of the evidence outweighed any prejudicial effect from the jury's knowing that defendant resisted police officers in the past. The jury was properly instructed that it could not consider the past conduct except as it related to the knowledge issue. However, the majority attempts to create a new requirement that, when the past crimes are relevant to knowledge, the past and current crimes must be similar. This attempt ignores reality because knowledge may be inferred from many circumstances of past conduct that are dissimilar on their facts to the current crime.

For example, a person might shoplift at a store and be detained by security guards at the store who identify themselves as security guards. The store might then call the police, and the responding officers might introduce themselves as police officers. Such a scenario would give that person experience in telling who are and who are not police officers. Compare this hypothetical prior crime to defendant's current crime. Shoplifting is nothing like resisting a police officer, yet the knowledge the person gained from the prior shoplifting is highly probative of whether the person actually was able to distinguish between security guards and police officers. Similarity can contribute to the probative value of the prior conduct, but it certainly is not the only, or even the most, probative factor. Despite this, the majority would exclude dissimilar prior crimes even if they provided strong evidence that defendant knew he was resisting police officers.

The majority found no cases requiring that prior conduct used to establish knowledge be similar to the present crime. (Maj. opn., *ante*, at p. 241.) That

is because there is no such requirement. The majority even cited a case making this point: " '[W]hen offered to prove knowledge, . . . the prior act need not be similar to the charged act as long as the prior act was one which would tend to make the existence of the defendant's knowledge more probable than it would be without the evidence.' [Citation.]" (*U.S. v. Vo* (9th Cir. 2005) 413 F.3d 1010, 1018.) Here, defendant's prior acts made it more probable that he actually distinguished between a security guard and a police officer on the night of his crime. Therefore, the trial court did not abuse its discretion in admitting the evidence.[1]

In any event, any error in admitting the evidence of defendant's prior crimes was harmless. It is not reasonably probable that defendant would have obtained a more favorable result absent the asserted error. (See *People v. Foster* (2010) 50 Cal.4th 1301, 1333–1334 [117 Cal.Rptr.3d 658, 242 P.3d 105].)

Defendant had a history with Justin McCall, the security guard. Six or eight times, McCall had confronted defendant and told him to leave the apartment complex's parking lot. On the evening of the crime, McCall, in his black security guard uniform, confronted defendant and defendant told McCall that McCall was "doing too much," implying that defendant was fed up with McCall's continuing insistence that defendant not loiter in the parking lot. And defendant was immediately hostile towards McCall. Therefore, defendant knew McCall only too well.

In the initial altercation on the evening of the crime, McCall sprayed pepper spray in defendant's face after defendant "shoulder-bump[ed]" McCall's chest. Defendant walked away, grabbing his eyes, so McCall's aim appears to have been true.

Within a minute or two after McCall pepper sprayed defendant, they met again at the complex's swimming pool. Defendant saw McCall from about 30 yards away and charged him. In McCall's words, defendant "turned, saw me, and then he just made a straight bee line for me." This was not a man who was debilitated or blinded by the pepper spray. He saw McCall and attacked him. McCall attempted to pepper spray defendant again, this time from five or six feet away. However, McCall was not sure whether he got defendant in the eyes; defendant did not rub his eyes like he had done before. In any event, defendant was not debilitated by this second pepper spraying because he continued to attack McCall until McCall, fearing for his life, pulled out his gun and shot in defendant's direction.

---

[1] For the same reasons, I would reject any argument that the trial court violated defendant's due process rights by admitting the evidence.

Defendant ran off. So, at this point, defendant was not debilitated and had been able to see and identify McCall, both before and after he was pepper sprayed the first time. And there is no evidence that defendant encountered any security officer that evening other than McCall, whom he recognized even after being pepper sprayed.

After McCall's encounters with defendant, on the same night, police officers, including Officers Luke Mosley, Lisa Khang, and Gerald Landberg, all in their navy blue Sacramento Police Department uniforms, arrived at the apartment complex.

McCall pointed out defendant, and the police officers went to confront defendant, telling McCall to stay behind. Even though it was nighttime, the area was well lit both from lights on the buildings and lights in the parking lot. The three police officers took positions outside the dumpster enclosure, where they had seen defendant. Defendant came out of the dumpster area, agitated. He was flailing his arms and yelling incoherently. During this time, he looked at the officers who were 15 to 20 feet away, but he also looked away. At one point, he assumed a fighting stance and stared at the officers. He was not rubbing his eyes and did not appear to have a problem seeing.

So, at this point, the area was well lit; neither McCall nor any other security guard was in the immediate area; the officers were dressed differently from McCall, wearing navy blue uniforms and not black uniforms; and defendant, who did not appear to have a problem seeing, looked at them and, by inference, would have seen that McCall was not with them.

The officers commanded defendant to get on the ground. Instead, he directed an expletive at them and ran away.

The majority concludes that the error it perceives in admission of evidence was not harmless because the evidence was not overwhelming. In arriving at this conclusion, the majority concentrates exclusively on facts it believes call into question the verdict. I recount and comment on each of the facts cited by the majority.

*It was night.* (Maj. opn., *ante,* at p. 251.) But the area was well lit.

*The uniforms of the security guards were black, and the police officers' uniforms were navy blue.* (Maj. opn., *ante,* at p. 251.) Again, the area was well lit, and defendant looked at the police officers and could see that McCall was not there.

*Defendant was intoxicated, agitated, and incoherent.* (Maj. opn., *ante,* at pp. 229, 252.) He was intoxicated and agitated. And he yelled incoherently.

But he obviously was not so incoherent that he could not attack McCall twice, take a fighting stance against the officers, address an expletive at the officers, and try to escape.

*Defendant had been sprayed twice with pepper spray.* (Maj. opn., *ante*, at p. 251.) But he recovered quickly after the first pepper spraying and may not have been affected at all by the second, attempted pepper spraying. In any event, by the time the police officers confronted him, he appeared to be suffering no ill effects of the pepper spray.

*The police officers did not identify themselves and did not use their sirens or flashing lights, and defendant did not see the police department patrol cars.* (Maj. opn., *ante*, at pp. 251–252.) This is true, but defendant saw the officers in a well-lit area.

*The evidence concerning defendant's opportunity to see the police officers outside the dumpster area was inconsistent.* (Maj. opn., *ante*, at p. 252.) It is true that the testimony of the police officers was not perfectly consistent, but there can be no doubt that (1) the area was well lit, (2) defendant saw the police officers and knew that McCall was not one of the officers then confronting him, and (3) the officers were wearing navy blue police department uniforms and not black security guard uniforms.

*The evidence concerning the police officers' chasing of defendant was inconsistent.* (Maj. opn., *ante*, at p. 252.) In my opinion, how the chase went down really has little to do with whether defendant knew the three were police officers. He saw them, fled, and was wrestled down and handcuffed.

The majority concludes that it is reasonably probable that defendant would have obtained a more favorable result absent the assertedly inadmissible evidence because "the irrelevant and nonprobative other crimes evidence the jury heard was [inherently and] undoubtedly prejudicial . . . ." (Maj. opn., *ante*, at p. 252.) As one might surmise from my comments about the evidence, I disagree that the evidence was inadmissible or that, even if it should not have been admitted, it was prejudicial. The jury was properly instructed concerning how to use the evidence of past conduct, and there was ample evidence that defendant knew that the three police officers whom he saw in a well-lit area were police officers.

In any event, the majority's approach to the harmless error analysis is unsound. "[A] 'miscarriage of justice' should be declared only when the court, 'after *an examination of the entire cause, including the evidence,*' is of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error."

(*People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243], italics added.) To establish prejudice, the majority would have to take into account all of the evidence—"the entire cause"—and explain why, based on all of the evidence, or at least all of the evidence the majority concluded was properly admitted, it was reasonably probable that defendant would have obtained a more favorable result without the disputed evidence. This harmless error analysis does not do that.

I would affirm.