Filed 4/23/25  P. v. Langi CA1/4
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

|  |  |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>REMUS SAM LANGI,<br><br>        Defendant and Appellant. | A168754<br><br>(San Mateo County Super. Ct. No. SC054893C) |

Remus Sam Langi was convicted of second degree murder in 2007.  (*People v. Langi* (Apr. 28, 2009, A119095 [nonpub. opn.]) (*Langi I*).)  In 2019, Langi filed a petition under what is now Penal Code[1] section 1172.6, seeking resentencing based on changes to the law of murder after his conviction.  The trial court summarily denied the petition, but we reversed with instructions to hold an evidentiary hearing.  (*People v. Langi* (2022) 73 Cal.App.5th 972, 984 (*Langi II*).)  The trial court held the required hearing and denied the petition on the merits.  Langi again appeals, arguing that the trial court erred by admitting evidence of a juvenile offense he committed and that substantial

---

[1] Undesignated statutory citations are to the Penal Code.

evidence does not support the trial court's findings. We find no error and affirm.

## BACKGROUND

### *Evidence of the offense*

In late December 2002, Miguel Martinez, Jose Martinez, Francisco Molina, Domingo Huerta, and Danny Jesus went out to celebrate Jesus's birthday.[2] After going to a party for a few hours, the group went to a dead-end street in East Palo Alto sometime after midnight. All five had something to drink at the party, although Miguel was taking it slow, and they continued drinking in East Palo Alto while standing in a circle. Sione Fakalata, Langi, Joe Ngaloafe, and a fourth individual approached. The first three appeared to be of Tongan descent, and the fourth man said he was Puerto Rican or Costa Rican. Fakalata was wearing black pants, a black hooded sweatshirt, and a black leather jacket. Langi was wearing black shorts and a black hooded sweatshirt, and Ngalaofe had on a red sweatshirt. Langi was 19 years old, 6 feet tall, and weighed 195 pounds at the time. The newcomers appeared to have been drinking, and Langi was slurring his words and saying he was drunk and high. The newcomers dispersed into the circle.

The discussion was friendly at first, with Miguel and his friends offering drinks to the newcomers and chatting. Langi bragged about his old days when he used to fight a lot and beat up on other guys. At one point, Miguel and Fakalata were face to

---

[2] Jose Martinez and Miguel Martinez were not related. To avoid ambiguity, we refer to them by their first names.

face, staring into each other's eyes confrontationally for a few seconds. Miguel eventually broke it off, said "It's cool," and offered Fakalata a drink. A little later on, Jose was talking to Fakalata and asked whether he knew Jose's friends who were Tongan and Samoan. This seemed to make Fakalata mad. He told Jose angrily, "I will knock you out, fool." Fakalata punched Jose hard in the face twice, and Jose fell to the ground. On the ground, Jose was hit in the head by fists or feet and felt something moving in his pocket where his keys were. When the beating and the feeling in his pocket stopped, Jose ran home. When he got there, he discovered his keys were missing.

Miguel was standing next to Jose and turned towards him when Fakalata hit him. Jesus testified at Langi's trial that Langi ran across and punched Miguel in the face. Miguel fell down. A police officer who interviewed Jesus in the hospital immediately after the incident and again a few weeks later wrote in his reports that Jesus said that it was Fakalata who hit and knocked down Miguel. But Jesus denied saying this, and the officer later testified that in his report he had confused Jesus's descriptions of Jose and Miguel because they had the same last name. The officer did not realize his error, so he repeated it in another report of a second interview a few weeks later. At Fakalata's trial, which took place a few months before Langi's, Jesus at first could not recall who hit Miguel, but then after a lunch break testified that Langi hit Miguel.

Huerta testified at Langi's trial that he saw Langi run towards Miguel and Jose, then Huerta looked away. When

Huerta looked back, Miguel was on the ground and not moving. His legs were on the sidewalk and his body was in the street. Langi was punching and kicking Miguel in the face and body. At the preliminary hearing, Huerta testified that before he turned away he saw Langi hit Miguel in the head. When Huerta looked back, Miguel was on the ground and someone was stomping on his face and body.

Molina testified at Langi's trial that he saw Fakalata swing at Miguel, but Molina did not know if Fakalata connected. Molina looked away because Langi was running towards Jose and Miguel. Molina saw Miguel still standing, and Molina looked away again. When Molina looked back again, Miguel was on the ground. Fakalata and Langi were hitting Jose, and then Langi was on top of Miguel hitting him hard with both fists.

At the hospital immediately after the incident, Molina told a police officer that the person wearing a red shirt had hit Miguel. Molina admitted at trial that he had told this to the police, but he said it was not correct. At the preliminary hearing, Molina first testified, as he did at Langi's trial, that he did not remember seeing why Miguel was on the ground. Later in the hearing, Molina testified that he saw Langi hit Miguel, Miguel on the ground, and Langi continuing to hit him. When confronted at the trial with a transcript of the latter portion of his preliminary hearing testimony, Molina remembered saying it. But at the trial he did not remember seeing Langi hit Miguel before Miguel was on the ground. Molina only remembered turning around and seeing Miguel on the floor and Langi hitting him.

Huerta and Jesus were also hit, knocked to the ground, stomped on the head, and they both felt hands in their pockets. Jesus lost his keys and wallet, but Huerta did not lose any property.

While Fakalata and Miguel were beating his friends, Molina was backing away from the scene and calling the police. Fakalata, Langi, and Ngalaofe walked towards Molina, so he hid. When the group passed Molina, he heard Langi saying that he wanted to go back to the scene. At the preliminary hearing, Molina testified that Langi said this loudly and angrily.

The police arrested Fakalata, Langi, and Ngalaofe shortly afterwards. (*Langi I*, *supra*, A119095.) In Langi's pockets were keys belonging to Jose and Miguel. (*Ibid.*) Jesus's wallet and keys were found near the scene. (*Ibid.*)

Dr. Peter Benson, a forensic pathologist, testified for the prosecution that Miguel died of brain swelling with herniation and brain death due to blunt head trauma. Miguel had discoloration on the outside of his right forearm that could have been a defensive injury and another injury on the inside of his left forearm. He had a bruise and a skull fracture on the back of his head. That area of the skull is fairly thick, indicating that the injury must have been caused by a lot of force. Miguel had a subdural hematoma, meaning a mass of blood between the brain and the lining of the skull. More force would have to be applied to a young person to cause a subdural hematoma than an older person. Miguel also had a contra coup injury to his brain,

meaning damage to the front of his skull associated with the injury to the back of his head.

Miguel also had injuries to his left cheek, right forehead, and right side of his lips. There were five other reticulated injuries on the sides of Miguel's head, which would have required a moderate amount of force. Dr. Benson opined that if Miguel had been knocked out when he hit his head on the ground, his muscles would have been floppy and not tense. Additional strikes to his head would have then caused additional movement to his brain and could have caused additional brain injury. The injury to the back of Miguel's head could have caused his death by itself. But according to Dr. Benson, the other injuries to his head probably did contribute by speeding up the dying process.

Langi presented testimony from another forensic pathologist, Dr. Paul Herrmann. Dr. Herrmann opined that Miguel's head and brain injuries from striking the ground caused his death. Dr. Herrmann did not believe Miguel would have survived his contra coup injuries. Dr. Herrmann agreed with Dr. Benson that the additional blows to Miguel's head could have caused more damage to his brain and somewhat contributed to his death. But Dr. Herrmann did not find that contribution to be terribly significant and could not state with certainty that they did contribute. Dr. Herrmann admitted that if Miguel had been stunned or knocked unconscious by a punch to his face, then his fall to the ground would have been worse because he would have been unable to protect himself.

### Trials

In 2005, "Ngaloafe pled guilty to several felony offenses, including robbery, battery with serious bodily injury, and assault by means of force likely to produce great bodily injury, in exchange for a stipulated term of 10 years in state prison." (*Langi I*, *supra*, A119095.)  In October 2006, Fakalata was convicted after a jury trial of first degree murder and other offenses and sentenced to 29 years, 8 months in prison.  (*Ibid.*; *People v. Fakalata* (Aug. 11, 2008, A116627) [nonpub. opn.].)  This court affirmed his conviction.  (*People v. Fakalata*, *supra*, A116627.)  In March 2007, a jury found Langi guilty of second degree murder, three counts of robbery, and battery with serious bodily injury.  (*Langi I*, *supra*, A119095.)  The trial court found true an allegation that Langi had a prior juvenile conviction for robbery and sentenced him to 38 years to life in prison.  (*Ibid.*) Langi appealed, and this court affirmed.  (*Ibid.*)

### Resentencing

In 2019, Langi filed a petition for resentencing under what is now section 1172.6.  He alleged that he had been convicted of murder based on the felony murder rule or the natural and probable consequences doctrine and could not now be convicted of murder because of changes the Legislature made to the statutes governing murder.  The trial court summarily denied Langi's petition, relying on a statement in *Langi I* that he had punched Miguel and caused Miguel to fall and hit his head on the sidewalk or curb.  (*Langi II*, *supra*, 73 Cal.App.5th at p. 977.)  The trial court concluded from this that the jury had found Langi

guilty as the actual killer, which made him ineligible for resentencing. (*Ibid.*)

Langi appealed and this court reversed. (*Langi II, supra,* 73 Cal.App.5th at p. 984.) We noted that the Legislature had amended what is now section 1172.6 to allow anyone convicted of second degree murder to petition for resentencing if the person was convicted based on the natural and probable consequences doctrine "or other theory under which malice is imputed to a person based solely on that person's participation in a crime." (§ 1172.6, subd. (a); see *Langi II,* at p. 978.) We then held, based on intervening guidance from the California Supreme Court, that the trial court erred by treating *Langi I*'s statement that Langi delivered the punch that caused Miguel to fall and hit his head as conclusive evidence that Langi was the actual killer and not eligible for resentencing. (*Langi II,* at pp. 979–980; see *People v. Lewis* (2021) 11 Cal.5th 952, 971–972.)

*Langi II* explained that while evidence in the record supported the statement in *Langi I,* "the record as a whole" from Langi's trial "leaves room to question" whether Langi threw the punch that led to Miguel's death. (*Langi II, supra,* 73 Cal.App.5th at p. 980.) The jury could have convicted Langi based on an aiding and abetting theory even if someone else threw the fatal punch. (*Ibid.*) The jury instructions for the aiding and abetting theory allowed the jury to impute malice to Langi based on his participation in a crime, without finding that he personally acted with malice. (*Id.* at pp. 981–983.) *Langi II,* at page 984, concluded, "Because the record of conviction does not

conclusively negate the possibility that the jury found appellant guilty of second degree murder by imputing to him the implied malice of the actual killer, without finding that he personally acted 'with knowledge of the danger to, and with conscious disregard for, human life' (CALJIC No. 8.31), an evidentiary hearing is required. At that hearing, the court may find that appellant was the actual killer or that he was an aider and abettor who facilitated the killing with personal disregard for human life, in which case his petition will be denied. If the prosecution fails to prove that he was either, he will be entitled to relief."

On remand, the trial court held the required hearing. The evidence at the hearing included transcripts of testimony at Langi's original trial, transcripts of testimony by Molina and Huerta at the preliminary hearing, and transcripts of Molina's 911 call and statement to the police in the hospital after the incident.

The prosecution and Langi also supplied additional evidence. The prosecution offered testimony about a 2000 incident. Someone bumped Ansel M. and punched his arm in the hallway one day at school when he was 15 years old. The person was confronting him, so Ansel M. said something like "chill out" and walked away. The next thing he remembered was someone pulling him off the ground and helping him to the nurse's office. He had an injury to his face and memory loss that day. Based on witness statements, a police officer at the time identified Langi as the person who punched Angel M. The trial court admitted

into evidence certain pages of a juvenile petition relating to Langi and this incident.

Langi presented testimony from Dr. Gangaw Zaw, a forensic psychologist. Dr. Zaw explained that adolescents' brain development is incomplete so they are much more impulsive and their ability to foresee the consequences of their actions is limited. Their problem-solving abilities are also limited by their lack of analytical ability and life experiences. They are more likely to take risks when in the presence of their peers. In response to a hypothetical question based on the facts of this case, Dr. Zaw testified that the incomplete brain development of an adolescent could impair the adolescent's ability to think about the consequences of the action of punching someone or striking someone who was already on the ground and not responding. However, Dr. Zaw never clinically evaluated Langi or examined the record of his case. Dr. Zaw agreed that there is spectrum of individual development and that if an adolescent committed a similar offense in the past, it would provide reason to believe the adolescent would understand the consequences of doing it again.

The trial court denied Langi's petition. It concluded beyond a reasonable doubt that Langi was the actual killer and acted with implied malice. It noted that Langi punched Miguel, causing him to lose consciousness, fall, and suffer a serious and likely fatal injury. The court also found that Langi continued to strike Miguel while he was unconscious and defenseless on the ground. In the alternative, the trial court found that Langi was a direct aider and abettor of Miguel's killer, knew his conduct

endangered Miguel's life and acted with conscious disregard for Miguel's life. The trial court found this was evident from the joint nature of the assault on Miguel after Langi knocked Miguel unconscious. The trial court's finding on implied malice was based on Langi's initial punch, continued beating of Miguel once he was unconscious, failure to render aid, immobilization of Miguel's friends by beating them, and angry expression of desire afterwards to return to the scene, apparently to continue the assault.

## DISCUSSION

### I.   Legal background

"Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Stats. 2018, ch. 1015) eliminated the natural and probable consequences doctrine as a basis for finding a defendant guilty of murder and limited the scope of the felony murder rule. [Citations.] The bill amended section 188 by adding the requirement that, outside of felony murder, 'to be convicted of murder, a principal in a crime shall act with malice aforethought. Malice shall not be imputed to a person based solely on his or her participation in a crime.' (§ 188, subd. (a)(3).) [¶] Among other things, Senate Bill No. 775 [(2021–2022 Reg. Sess.) (Stats. 2021, ch. 55, § 2)] expanded Senate Bill No. 1437's mandate by eliminating any 'other theory under which malice is imputed to a person based solely on that person's participation in a crime' as a means of finding a defendant guilty of murder. (§ 1172.6, subd. (a).)" (*People v. Love* (2025) 107 Cal.App.5th 1280, 328 Cal.Rptr.3d 865, 870.) "However, 'Senate Bill 1437 relief is unavailable if the defendant

was either the actual killer, acted with the intent to kill, or "was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of [Penal Code] Section 190.2." ' " (*People v. Love, supra,* 328 Cal.Rptr.3d at p. 870.)

" '[S]ection 1172.6 is the statutory mechanism for determining whether to retroactively vacate a final murder, attempted murder, or manslaughter conviction that does not comply with the new, narrower definitions.' [Citation.] After a defendant files a petition alleging entitlement to relief, and makes a prima facie showing of such entitlement (§ 1172.6, subds. (a) & (b)(1)(A)), 'then the court must in most cases convene an evidentiary hearing where the People bear the burden of establishing beyond a reasonable doubt that the defendant is guilty of the pertinent crime under the new, narrower definitions. (§ 1172.6, subds. (c) & (d).)' [Citation.] At that evidentiary hearing, the court may consider admissible evidence admitted at any prior hearing or trial and 'new or additional evidence.' (§ 1172.6, subd. (d)(3).) If the People do not meet their burden of proof, the conviction must be vacated, and the defendant resentenced." (*People v. Zavala* (2024) 105 Cal.App.5th 366, 373.)

"Second degree implied malice murder remains valid notwithstanding the recent changes" wrought by Senate Bill Nos. 1437 and 775. (*People v. Gudiel* (2024) 107 Cal.App.5th 848, 859.) Implied malice has physical and mental components. (*People v. Cravens* (2012) 53 Cal.4th 500, 508 (*Cravens*).) The physical component is met if " 'the killing is proximately caused

by " 'an act, the natural consequences of which are dangerous to life.' " ' " (*People v. Reyes* (2023) 14 Cal.5th 981, 988; see *Cravens*, at p. 508.)  The mental component is satisfied if the defendant " ' " 'knows that his conduct endangers the life of another and . . . acts with conscious disregard for life.' " ' [Citation.] ' "To be considered the proximate cause of the victim's death, the defendant's act must have been a substantial factor contributing to the result, rather than insignificant or merely theoretical." ' " (*Reyes*, at p. 988; accord, *Cravens*, at p. 508.)[3]

## II.  Admissibility of evidence of Langi's juvenile offense

Langi challenges the trial court's decision to admit evidence regarding his assault as a juvenile on a fellow student.  He argues that this evidence does not meet any of the Evidence Code section 1101, subdivision (b) exceptions to the bar on admission of evidence of a defendant's other acts.  (See § 1172.6, subd. (d)(3) ["The admission of evidence in the [resentencing evidentiary] hearing shall be governed by the Evidence Code, except that the court may consider evidence previously admitted at any prior hearing or trial that is admissible under current law, including witness testimony, stipulated evidence, and matters judicially noticed"].)

---

[3] Because, as we explain *post*, we affirm the trial court's finding that Langi was the actual killer who acted with implied malice, we need not discuss his liability for murder under current law based on an aiding and abetting theory.  (See *People v. Reyes*, *supra*, 14 Cal.5th at pp. 990–991 [setting out the elements of a direct aiding and abetting theory of implied malice murder].)

"As a general rule, evidence of uncharged crimes is inadmissible to prove the defendant had the propensity or disposition to commit the charged crime. ([Evid. Code,] § 1101, subd. (a); [citations].) 'The reason for this rule is not that such evidence is never relevant; to the contrary, the evidence is excluded because it has too much probative value.' [Citations.] ' "The natural and inevitable tendency" ' is to give excessive weight to the prior conduct and either allow it to bear too strongly on the present charge, or to take the proof of it as justifying a conviction irrespective of guilt of the present charge. [Citations.] [¶] Evidence of other crimes is admissible, however, when relevant for a non-character purpose — that is, when it is relevant to prove some fact other than the defendant's criminal disposition, such as "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake of fact or accident." ([Evid. Code,] § 1101, subd. (b); [citations].)

"Although a prior criminal act may be relevant for a non-character purpose to prove some fact other than the defendant's criminal disposition, the probative value of that evidence may nevertheless be counterbalanced by a section 352 concern. Evidence may be excluded under section 352 if its probative value is 'substantially outweighed by the probability that its admission [would] . . . create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.'

"Thus, 'the admissibility of uncharged crimes depends upon three factors: (1) the materiality of the facts sought to be proved; (2) the tendency of the uncharged crimes to prove or disprove the

material fact [i.e., probative value]; and (3) the existence of any rule or policy requiring the exclusion of relevant evidence [i.e., prejudicial effect or other section 352 concern].' [Citations.] [¶] Courts subject other crimes evidence to ' "extremely careful analysis" ' [citation]  and review the admission of such evidence for abuse of discretion [citation]." (*People v. Hendrix* (2013) 214 Cal.App.4th 216, 238.)

"Whether similarity is required to prove knowledge and the degree of similarity required depends on the specific knowledge at issue and whether the prior experience tends to prove the knowledge defendant is said to have had in mind at the time of the crime.  For example, knowledge of the dangers of driving while under the influence can be obtained through the general experience of having suffered a driving under the influence conviction [citation], from the knowledge obtained in driving under the influence classes [citations] or from the admonition required by Vehicle Code section 23593 upon a DUI-related conviction.  While prior similar driving conduct and other similar circumstances would enhance the probative value, other crimes evidence may be admissible even though similar only in a general way, i.e., the prior events involve prior DUI offenses.  This is so because in any of these examples, the evidence supports an inference that the defendant was aware of the dangers of driving while under the influence at later times when he or she drove." (*People v. Hendrix, supra*, 214 Cal.App.4th at p. 241, fn. omitted.) This awareness is relevant because it tends to establish a "defendant's knowledge — gained in the course of the prior

misconduct — of the natural consequences, dangerous to life, of the reckless operation of a motor vehicle, and of his persistence in that behavior, thus evidencing a conscious disregard for the lives of others on the road.  These mental features, of course, comprise the mens rea of implied malice, thereby supporting an accusation of second degree murder." (*People v. Ortiz* (2003) 109 Cal.App.4th 104, 111–112, italics omitted.)

Evidence of Langi's juvenile offense was relevant here in precisely the same fashion as evidence of a prior driving under the influence conviction in a murder trial.  The prosecution's theory of implied malice at the resentencing hearing, consistent with several precedents we discuss *post*, was that the natural consequences of knocking Miguel unconscious while he was standing on concrete or asphalt were that Miguel would fall and suffer a serious head injury, and that Langi knew and consciously disregarded the risk of such consequences.  Evidence that Langi had previously punched Ansel M. hard enough to knock him unconscious and cause him to fall down, and was found responsible by a juvenile court for doing so, was relevant to proving this theory.  If Langi could punch someone hard enough to knock him to the ground senseless before, he could do it again. In light of Langi's own personal experience, Langi's decision to punch Miguel on the sidewalk or asphalt of a cul-de-sac in East Palo Alto could therefore demonstrate his conscious disregard for the risks that Miguel would fall to the ground.

Langi resists this conclusion by pointing out that Ansel M. did not suffer a head injury like Miguel and arguing that this

makes Langi's punch of Ansel M. probative only of a risk of great bodily injury, not of a risk dangerous to human life. Langi's juvenile offense was certainly not definitive proof of malice in the same way as, for example, evidence that he had previously killed someone by knocking him out on a hard surface. But that does not entirely vitiate the evidence's probative value. It still provided one of the links in the chain, which was sufficient to make it admissible. The prosecution could prove that Langi disregarded a risk that Miguel would fall to the ground and then then rely on common sense (and, as discussed *post*, judicial precedent) to establish the risk to human life from such a fall on a concrete or asphalt surface.

Cases dealing with the admission of prior DUI or reckless driving evidence in a later implied malice murder prosecution bear this out. (See *People v. Ortiz*, *supra*, 109 Cal.App.4th at pp. 112–115 [discussing cases].) Evidence of a prior DUI conviction or reckless driving, even when the defendant did not previously injure or kill anyone, is admissible because the experience demonstrates the risk and, in the case of a conviction, the legal consequences underscore the significance of the danger. (*Ibid.*) In the same way, Langi did not need to have killed Ansel M. with his punch to learn from the experience and his juvenile court disposition that he could, with a punch, knock someone unconscious and cause him to fall down in a dangerous way.

Similarly, *Cravens*, *supra*, 53 Cal.4th at page 509, stated that evidence of a defendant's prior sucker punches that did not cause death was admissible as evidence of a common plan or

scheme in a prosecution for murder based on sucker punching and causing someone to fall and hit his head. We discuss *Cravens* in more detail *post*, but this aspect of the decision supports our conclusion here that evidence of Langi's juvenile offense was likewise admissible, even though the prior punch did not result in death.

Langi also argues briefly that the evidence of his juvenile offense was inherently prejudicial, which we interpret as an argument that the evidence was inadmissible under Evidence Code section 352 because its probative value was substantially outweighed by its prejudicial effect. (*People v. Hendrix, supra,* 214 Cal.App.4th at p. 238.) Given that the evidence was probative of implied malice, one of the key issues in the resentencing hearing, we are not convinced that the evidence was made inadmissible by the small possibility that the trial court would improperly rely on it as propensity evidence to find Langi was Miguel's actual killer.

## III. Substantial evidence of implied malice

Because the question at the evidentiary hearing on a resentencing petition under section 1172.6 is factual, we review a trial court's findings at such a hearing for substantial evidence. (*People v. Davis* (2024) 107 Cal.App.5th 500, 328 Cal.Rptr.3d 198, 205.) "This means '[w]e " 'examine the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence — that is, evidence that is reasonable, credible, and of solid value that would support a rational trier of fact in finding [the defendant guilty] beyond a reasonable

doubt.' " [Citation.] Our job on review is different from the trial judge's job in deciding the petition. While the trial judge must review all the relevant evidence, evaluate and resolve contradictions, and make determinations as to credibility, all under the reasonable doubt standard, our job is to determine whether there is any substantial evidence, contradicted or uncontradicted, to support a rational fact finder's findings beyond a reasonable doubt.' " (*Id.* at pp. 205–206.)

Our Supreme Court recently remarked, in a case applying the substantial evidence standard in a direct appeal, " ' "Evidence which merely raises a strong suspicion of the defendant's guilt is not sufficient to support a conviction. Suspicion is not evidence, it merely raises a possibility, and this is not a sufficient basis for an inference of fact." [Citation.] The substantial evidence rule mandates consideration of the weight of the evidence before deferring to the conclusions drawn from the evidence by the trier of fact. "[I]n determining whether the record is sufficient . . . the appellate court can give credit only to 'substantial['] evidence, i.e., evidence that reasonably inspires confidence and is 'of solid value.' " ' " (*People v. Collins* (2025) 17 Cal.5th 293, 307.) However, the court did not state that it was changing the substantial evidence standard, and it has elsewhere stated, " 'Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.] We resolve neither

credibility issues nor evidentiary conflicts; we look for substantial evidence. [Citation.]' [Citation.] A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support" ' the [fact finder]'s verdict." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357; see *People v. Davis*, *supra*, 28 Cal.Rptr.3d at p. 206 [applying *Zamudio* to review of ruling on § 1172.6 petition].)

### A.   *Actual killer*

Langi first attacks the trial court's finding that he was the actual killer of Miguel by pointing to discrepancies between witnesses' testimony at Langi's original trial and prior testimony or statements to the police. Langi points out that Molina and Huerta testified at Langi's trial that they saw Langi move or run towards Miguel but looked away, and when they looked back Miguel was on the ground and Langi was beating him. But in the preliminary hearing, they both said they saw Langi hit Miguel in the face and Molina saw Langi knock Miguel to the ground. Langi admits that Jesus testified clearly at the trial that he saw Langi hit Miguel and Miguel fall down. But he points out that a police officer wrote in a report that at the hospital immediately after the incident and in an interview a few weeks later that Jesus had identified Fakalata as the person who knocked Miguel down.

The evidentiary conflicts that Langi highlights do not convince us that the record as a whole lacks sufficiently solid or credible evidence that Langi hit Miguel and caused him to fall.

Under substantial evidence review, it was for the trial judge to assess credibility and resolve any conflicts in the evidence. (*People v. Davis*, *supra*, 28 Cal.Rptr.3d at p. 206.)  Only if the discrepancies in the evidence were so severe that the witnesses' testimony could not reasonably inspire confidence (*People v. Collins*, *supra*, 17 Cal.5th at p. 307) or under no hypothesis would support the verdict (*People v. Zamudio, supra*, 43 Cal.4th at p. 357) could we reverse the trial court's finding.  The inconsistencies Langi highlights do not rise to this level.

Beginning with Jesus, his trial testimony was clear that Langi hit Miguel.  Jesus was an eyewitness to the incident and in a good position to identify the perpetrator, so his testimony carries significant weight.  Jesus denied telling the police officer that Fakalata knocked down Miguel, and the trial court could reasonably choose to believe Jesus's trial testimony rather than the police officer's reports of his prior statements.  This was especially reasonable here, since the police officer who wrote the reports testified and explained that he misunderstood Jesus's account.

If the trial court wanted corroboration of Jesus' account, it could justifiably rely on Molina's and Huerta's preliminary hearing testimony that Langi hit Miguel and knocked him down over their testimony at trial that they did not remember.  The preliminary hearing took place in October 2003, less than a year after Miguel's death.  Langi's trial, by contrast, took place over four years after the incident, in March 2007.  It is reasonable to think that their memories faded in between the preliminary

hearing and the trial. Their preliminary hearing testimony accorded with Jesus's trial testimony, identifying Langi as the person who punched Miguel and knocked him down. Additionally, while Molina initially did not remember mentioning Langi's punch to the police, after refreshing his recollection by reading a police report, Molina recalled previously telling the police that Langi hit Miguel. In any event, even if the trial court relied solely on Molina's and Huerta's trial testimony and disregarded their preliminary hearing testimony, there was no actual inconsistency between Jesus and Molina or Huerta. Molina and Huerta merely said at trial that they did not see an actual punch land; neither testified that anyone else hit Miguel or knocked him down.

Langi notes that Fakalata was the aggressor who got in the staring contest with Miguel earlier and started the fighting by punching Jose, but this makes no difference. There was sufficient evidence that Langi delivered the specific punch that knocked Miguel unconscious and to the ground, which supports the trial court's finding.

Langi also argues that the medical evidence complicates the picture, but it does not seriously call into question the eyewitnesses' testimony. Dr. Benson testified that the other injuries to Miguel's head and face probably contributed by hastening his death. But Dr. Benson was clear that Miguel's head injury could have caused death all by itself, so the punch that knocked Miguel down proximately caused his death, regardless of whether Miguel's other injuries sped up the process.

(*People v. Reyes*, *supra*, 14 Cal.5th at p. 988 [proximate cause means a substantial factor, rather than an insignificant or theoretical one].) Langi's own expert testified at trial that the additional injuries did not significantly contribute to Miguel's death. Langi also suggests that the apparent defensive injury to Miguel's forearm shows Miguel was not knocked immediately unconscious by the punch. But there is no clear indication of when Miguel injured his forearm, while the record as a whole is clear that Miguel suffered significant head and brain injuries when he struck his head upon falling down after being punched. Langi's punch caused the fall, which caused the head and brain injuries, which caused Miguel's death. Substantial evidence supports the trial court's finding that Langi was Miguel's actual killer.

## B. *Implied malice*

Separate from his argument about the evidence that he delivered the fatal punch to Miguel, Langi challenges the evidentiary support for the trial court's finding that he acted with implied malice. As noted *ante*, implied malice has physical and mental components, and Langi contends the evidence here is insufficient to prove either.

This is not the first murder case in which a defendant knocked a victim unconscious and the victim fell and struck his head on a hard surface. Langi recognizes that in three prior cases courts have affirmed second degree murder convictions in scenarios that resemble the facts here, but he argues the cases

are factually distinguishable.  We therefore begin by describing the three relevant precedents.

### a. *Efstathiou*

In *People v. Efstathiou* (1941) 47 Cal.App.2d 441, 442, the defendant, who was a cook, followed his employer out of a restaurant onto the street and got into a fight in which he punched the employer and knocked him down.  The defendant crossed the street, then came back and kicked the employer on the ground.  (*Ibid.*)  The Court of Appeal held that the jury reasonably convicted Efstathiou of second degree murder even if it found the employer died because he struck his head on the sidewalk rather than from Efstathiou's punches.  (*Id.* at p. 443.)  *Efstathiou* explained, "The consequences which would follow a fall upon a concrete walk must have been known to" the defendant.  (*Ibid.*)

### b. *Cravens*

In *Cravens, supra,* 53 Cal.4th 500, 503, the victim got into a disagreement with Cravens and his friends at a bar.  The victim was five feet 10 inches tall and weighed about 180 pounds, while Cravens was 6 feet tall and 240 pounds.  (*Id.* at p. 506.)  Cravens and his friends followed the victim home, and a fight ensued between the victim and one or more of Cravens' friends.  (*Id.* at p. 504.)  Eventually the fight ended, and the victim was standing in the street, not behaving aggressively (according to the prosecution's witnesses), when Cravens "coldcocked" the victim unexpectedly from the curb.  (*Id.* at p. 505.)  The punch was described as "extremely hard."  (*Ibid.*)  Witnesses thought the

victim was unconscious before he hit the ground.  (*Ibid.*)  The victim's skull made a loud noise when it hit the ground, and blood started to stream from the back of his head.  (*Ibid.*)  Cravens later bragged and laughed about knocking out the victim with one punch with his non-dominant hand and said he was willing to go back at the victim again.  (*Id.* at p. 506.)  The victim had a blood alcohol level of .17 percent and died a few days later.  (*Id.* at p. 505.)

The Court of Appeal reduced Cravens' second degree murder conviction to manslaughter, but the Supreme Court, with one justice dissenting, reversed that ruling.  (*Cravens, supra,* 53 Cal.4th at pp. 506, 512; see *id.* at pp. 514–518 (dis. opn. of Kennard, J.).)  It cited *People v. Munn* (1884) 65 Cal. 211, 212–213, which observed that an assault with a fist can make a killing murder but that the law generally distinguishes between assaults with deadly weapons and simple assault and battery.  (*Cravens,* at p. 508.)  The *Cravens* court then concluded on the facts before it that "the manner of the assault and the circumstances under which it was made rendered the natural consequences of defendant's conduct dangerous to life."  (*Ibid.*)

The court first noted that Cravens "targeted a smaller and shorter victim who was intoxicated, exhausted, and vulnerable" from the previous drunken brawl.  (*Cravens, supra,* 53 Cal.4th at p. 508.)  Second, *Cravens* described the defendant's punch as very hard, hard enough to knock the victim unconscious, and cited the fact that he hit his head on the ground with an audible cracking sound.  (*Id.* at p. 509.)  Third, *Cravens* said the defendant gained

extra inches of height for his punch by standing on the curb while the victim was at street level, guaranteeing the victim would fall on a hard surface, and cited *Efstathiou*'s remark about the predictability of consequences of falling on a concrete walk. (*Ibid.*) Fourth, "[p]erhaps worst of all" to the court, *Cravens* faulted the Court of Appeal for ignoring the facts that Cravens' punch was a sucker punch and that he had a history of using sucker punches to his advantage, established through evidence of prior incidents admissible to demonstrate a common plan or scheme. (*Id.* at pp. 509–510.) *Cravens* concluded that the defendant's punch was not at all ordinary, but rather "was an extremely powerful blow to the head calculated to catch the impaired victim off guard, without any opportunity for the victim to protect his head, and thereby deliver the victim directly and rapidly at his most vulnerable to a most unforgiving surface." (*Id.* at p. 511.)

Finally, *Cravens* found the record supported the jury's finding of the mental component of implied malice. "[T]he jury was entitled to infer defendant's subjective awareness that his conduct endangered [the victim's] life from the circumstances of the attack alone, the natural consequences of which were dangerous to human life." (*Cravens*, *supra*, 53 Cal.4th at p. 511.) *Cravens* also observed that Cravens had egged on his friends to fight the victim beforehand, took no steps to check on the victim's condition or secure emergency assistance after knocking him unconscious and splitting his head open on the sidewalk,

expressed a willingness to fight the victim more, and bragged and laughed about his prowess afterwards.  (*Ibid.*)

One justice in *Cravens* stated in a concurrence that the facts of the case fell "just within the outer bounds of conduct sufficiently dangerous to satisfy" the test of implied malice that looks at whether an act's natural consequences are dangerous to life.  (*Cravens, supra,* 53 Cal.4th at p. 514 (conc. opn. of Liu, J.).)  The dissenting justice, by contrast, was not convinced that Cravens' extra height on the curb or history of sucker punches made the victim's death a natural consequence of the single blow.  (*Cravens, supra,* 53 Cal.4th at pp. 516–517 (dis. opn. of Kennard, J.).)  Nor was she convinced that Cravens' conduct beforehand in egging on his friends to fight the victim or afterwards in not seeking help for the victim and trivializing the incident indicated anything about Cravens' subjective awareness of the risk of his punch.  (*Id.* at p. 517.)  The dissenting justice also noted that Cravens hit the victim with his non-dominant hand and had previously sucker punched other victims without inflicting any life-threatening injury.  (*Ibid.*)

### c.  *Palomar*

The victim in *People v. Palomar* (2020) 44 Cal.App.5th 969, 971–972 (*Palomar*), drank 10 beers in a bar and made a derogatory remark about Mexicans.  Palomar, who was a " 'pretty big guy,' " told others he intended to " 'fuck homeboy up,' " and someone warned the victim that he would be " 'jumped' " when he left the bar.  (*Id.* at p. 972.)  The victim, who was five feet 10 inches tall and a solid, well-built 225 pounds, did not take the

warning seriously.  (*Ibid.*)  While the victim and a friend were walking away from the bar, they heard a noise and turned around.  (*Ibid.*)  Palomar punched the victim in the face with an " 'incredibly powerful' " punch.  (*Ibid.*)  The victim stayed standing for a moment, his eyes closed, and then he fell slowly backwards towards the curb.  (*Id.* at p. 973.)  The victim's head hit the edge of the curb and sounded like a watermelon being dropped off a building.  (*Ibid.*)  He began bleeding from his ears, mouth, and back of his head.  (*Ibid.*)  Palomar walked away.  (*Ibid.*)

The *Palomar* court compared the facts to *Cravens* and, over a dissent, affirmed the defendant's second degree murder conviction.  (*Palomar, supra*, 44 Cal.App.5th at pp. 975–980.)  For the physical component of malice, *Palomar* first noted that the victim was obviously intoxicated and therefore vulnerable, while Palomar was not intoxicated.  (*Id.* at p. 976.)  Second, *Palomar* inferred that the punch was very hard because it knocked the victim unconscious despite his stature.  (*Id.* at pp. 976–977.)  Third, Palomar's conduct guaranteed the victim would fall on a hard surface, whose consequences must have been known to the defendant (citing *Efstathiou*).  (*Id.* at p. 977.)  Fourth, Palomar surreptitiously approached the victim and used a sucker punch.  (*Ibid.*)

For the mental component of malice, *Palomar*, like *Cravens*, held the jury could infer Palomar's subjective awareness of the risk of his conduct from the circumstances of the attack, whose natural consequences were dangerous to human life.

(*Palomar*, *supra*, 44 Cal.App.5th at p. 978.) *Palomar* also noted that Palomar must have planned the attack, since someone warned the victim he would be jumped. (*Ibid.*) *Palomar* finally observed that the defendant simply walked away even though he must have known the victim was severely injured, given the sound his head made when it hit the edge of the curb. (*Ibid.*)

A dissenting justice distinguished *Cravens* because the victim there was vulnerable from a prior beating by the defendant's friends and in the street while Cravens was on the curb, whereas the victim was roughly the same size as Palomar, was on the same level, and had dismissed a warning about being jumped. (*Palomar*, *supra*, 44 Cal.App.5th at pp. 981–982 (dis. opn. of Perren, J.).) The majority was not swayed by these distinctions. (*Palomar*, *supra*, 44 Cal.App.5th at pp. 978–980.) The keys to *Cravens*, according to the *Palomar* majority, were "the victim's extreme vulnerability and the powerful sucker punch to the head delivered while the victim was standing on a concrete surface." (*Id.* at p. 979.) The majority also found the facts of that case were more egregious than *Cravens* because Palomar made a deadly stealth attack and the jury could have inferred he was motivated by racial animus, given the victim's derogatory comment about Mexicans. (*Id.* at pp. 979–980.)

### d. Analysis

Langi questions whether the facts of this case resemble those of *Cravens*, *Efstathiou*, and *Palomar* closely enough to support the trial court's finding that he acted with implied malice and therefore could be convicted of second degree murder as

Miguel's actual killer. While there are some factual differences, we conclude the facts support the trial court's findings on both components of implied malice.

On the physical component of malice, Langi points out that there is no evidence Miguel was intoxicated or was smaller than Langi. This is correct. Jose testified at the trial that Miguel was "taking it slow" and would drive, so the trial court could infer that he was not drunk. Langi, by contrast, described himself as drunk and high and was slurring his words. While the Attorney General describes Miguel as smaller, he offers no record citation to support the assertion. The record indicates that Langi was six feet tall and 195 pounds, but we are aware of no evidence of Miguel's size or stature. However, Palomar was apparently comparable in size to his victim. (See *Palomar*, *supra*, 44 Cal.App.5th at p. 972 [Palomar was " 'a pretty big guy' "]; *id.* at p. 982 (dis. opn. of Perren, J.) [Palomar and victim were roughly the same size].) Miguel was also vulnerable because he was not expecting Langi's punch, as discussed *post*. Although Miguel's relative size and sobriety may weigh against a finding of malice, they are not dispositive.

Langi is incorrect when he also asserts that there was no evidence of the force of the punch that knocked Miguel down or of the force with which his head hit the sidewalk. While no witnesses described the force of Langi's punch to Miguel, it could be inferred that the punch was extremely hard from its consequences alone, given that it knocked Miguel senseless and caused him to fall immediately to the ground. (See *Cravens*,

*supra*, 53 Cal.4th at p. 509 [punch was hard enough to knock the victim unconscious, despite his youth and fitness, before he hit the ground]; *Palomar*, *supra*, 44 Cal.App.5th at pp. 976–977 [could infer strength of punch from fact that it knocked out victim].) The force of Miguel's fall can also be inferred to have been as severe as those in the prior cases. It cracked Miguel's skull in a fairly thick area, which Dr. Benson testified would have required a lot of force.

Langi also asserts that Miguel was not taken by surprise, unlike the victims in *Cravens* or *Palomar*. The trial court, however, could reasonably infer that Miguel was taken unawares. An altercation had already begun when Fakalata punched Jose, as Langi notes. But Molina, Jesus, and Huerta all testified that Langi "ran" across the circle towards Miguel, while Miguel had turned towards Fakalata and Jose. It is reasonable to conclude from this that Langi punched Miguel unexpectedly while Miguel's attention was focused on Jose and Fakalata. The fact that Langi got a running start could also be inferred to have added force to his punch, analogous to the advantage Cravens had by standing on a curb while his victim was in the street. (*Cravens*, *supra*, 53 Cal.4th at p. 509.) Langi argues that the defensive bruise on Miguel's forearm means either that Miguel defended himself before he was punched or that he was not unconscious when he hit the ground. As noted *ante,* there is no direct evidence of when Miguel suffered this injury, so it is difficult to place much weight on it. Miguel could have suffered it

when Fakalata first swung at him, which Molina recalled, before Langi unexpectedly knocked Miguel senseless.

As in *Cravens* and as discussed *ante*, the evidence of Langi's juvenile offense indicates that he had prior experience and knowledge of the consequences of his powerful punches. Langi questions how the violent incident with Ansel M. could support a finding of implied malice because the prior encounter was not fatal. The dissent in *Cravens* made the same point (*Cravens*, *supra*, 53 Cal.4th at p. 516 (dis. opn. of Kennard, J.)), but the *Cravens* majority nonetheless relied on that defendant's history of sucker punches to affirm the jury's finding that the defendant's sucker punch on the victim was "predictably dangerous to human life" (*id.* at p. 510). Langi's prior assault also provides sufficient reason for the trial court to discount the significance of Dr. Zaw's testimony about adolescent brain development. (See *People v. Pittman* (2023) 96 Cal.App.5th 400, 417 [youth is relevant circumstance bearing on whether defendant had implied malice].) Dr. Zaw admitted that an adolescent's prior experience with an action would provide reason to believe the adolescent could foresee the consequences of repeating it.

On the mental component of implied malice, we may infer Langi's subjective awareness from the factual circumstances supporting the physical component of implied malice. (*Cravens*, *supra*, 53 Cal.4th at p. 511.) Additionally, Langi was repeatedly bragging about his ability to beat people up when he first joined the circle of friends at the end of Garden Street, which could

indicate that he already had violent intentions and was trying to intimidate his victims.  The evidence of Langi's conduct after beating Miguel also resembles that of the defendants in *Cravens* and *Palomar*, in that Langi did not check on Miguel's condition or seek emergency assistance for him.  (*Ibid.*; *Palomar*, *supra*, 44 Cal.App.5th at p. 978.)  Additionally, like in *Cravens*, at page 511, after the assault Langi loudly and angrily said he wanted to return to the scene and, presumably, resume beating on Miguel and the other victims.

Langi protests that there is no evidence he was aware of the severity of Miguel's injuries, since there was no indication that Miguel was bleeding as much as the victims in *Cravens* or *Palomar*.  But Miguel was motionless on the ground after falling, which suggests he had suffered a significant injury.  But even if the facts here differed from *Cravens* or *Palomar* in this respect, and despite the absence of evidence of planning like in *Palomar*, there are two other differences that make this case just as serious and that cement the question of Langi's mental component of implied malice.

First, where the defendants in *Cravens* or *Palomar* walked away from the victims after knocking them unconscious with a single blow, Langi actually continued the assault, like the defendant in *Efstathiou*.  (See *People v. Efstathiou*, supra, 47 Cal.App.2d at p. 442 [defendant came back to kick victim after hitting him and knocking him down].)  Once Miguel was on the ground and not moving, Langi continued to kick him and hit him hard with both fists.  Langi delivered blows to Miguel's body as

well as his face, thereby delivering force to his head, where he had already been severely injured.  Second, Langi also beat Miguel's friends, which prevented them from defending him. These facts, which the trial court cited, elevate this case above an unintentional homicide following a battery and support the trial court's finding of implied malice.

## DISPOSITION

The judgment is affirmed.

BROWN, P. J.

WE CONCUR:

STREETER, J.
GOLDMAN, J.

*People v. Langi* (A168754)